IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LEWIS SOLOVITZ | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-09-0343 |
| | § | |
| | § | |
| THE KROGER CO., INC. | § | |
| | § | |
| Defendant | § | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant The Kroger Co., Inc.[1] ("Kroger") submits this motion for final summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and would respectfully show the court as follows.

**I.**

**SUMMARY OF ARGUMENT**

This case arises out of an investigation of Plaintiff for theft, during which he voluntarily resigned from employment with Kroger. Plaintiff now claims he was wrongfully terminated and has asserted a number of claims which are legally deficient under Texas and Federal law.

During all times relevant to this lawsuit, Plaintiff worked for Kroger on the front end as a sacker. On or about October 31, 2007, Plaintiff met with a Kroger risk management officer to discuss suspicious activity on Plaintiff's Kroger Plus Card. Kroger uses Plus Cards to track individual transactions and to store monetary credits for its pharmacy coupon program. Kroger's investigation revealed that Plaintiff's wife was regularly circumventing Kroger's policy limiting

---

[1] In his Original Petition, Plaintiff named The Kroger Co., Inc. as the Defendant in this matter. "The Kroger Co., Inc." is an entity that does not exist; rather "The Kroger Co." is the proper name of the entity Plaintiff appears to have intended to name. Further, the correct Defendant is Kroger Texas L.P., which was Plaintiff's employer, not The Kroger Co.

customers to one coupon per week by taking prescriptions to multiple stores (sometimes even on the same day), and collecting coupon credits on Plaintiff's Kroger Plus Card for prescriptions belonging to family members outside of Plaintiff's household, which was also not allowed.  These actions resulted in cash credits to the Plaintiff totaling hundreds of dollars, which Plaintiff in turn redeemed for his Kroger purchases.  After being confronted with Kroger's evidence on October 31, 2007, Plaintiff resigned to avoid possible termination or criminal prosecution.

Based on the undisputed facts in this case, Plaintiff's lawsuit should be dismissed for the reasons stated below.

1.      **Breach of Contract.**  Plaintiff's employment was governed by a collective bargaining agreement between Kroger and the United Food and Commercial Workers Union ("Union Contract").  Plaintiff's exclusive remedy under the Union Contract was through a grievance and arbitration process, which he never utilized.  Therefore, Plaintiff's breach of contract claim should be dismissed, as a matter of law.  Further, any claim that Plaintiff had a separate verbal agreement based on a supervisor's statements is contrary to Plaintiff's own admissions and barred under Texas law.

2.      **Wrongful Termination.**  Plaintiff's claim for wrongful termination is baseless, as no such general cause of action exists under either state or federal law.  To the extent Plaintiff's complaint is construed as stating a claim for disability discrimination, such a claim is defective, because Plaintiff never exhausted his administrative remedies by filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

3.      **Defamation.**  Under well established Texas law, an employer has a qualified privilege to investigate employees suspected of theft and other impropriety in the work place. Plaintiff has no evidence that Kroger made any statements regarding Plaintiff outside of the

investigation process, or that the investigation was conducted in bad faith.   Similarly, alleged defamatory statements made to the Texas Workforce Commission in the defense of Plaintiff's unemployment claim are privileged under Texas law, and cannot serve as the basis for a defamation claim.

   ***4.  Intentional Inflection of Emotional Distress (IIED).***   IIED claims are severely limited under Texas law, and can only be used as a gap filler tort where a plaintiff has no other avenue for relief.   Such facts are not present in this case, as evidenced by the myriad of other claims asserted.   Further, Plaintiff's allegations, even if true, fall woefully short of stating the type of outrageous conduct necessary to avoid summary judgment.

   As explained herein, Plaintiff's claims are both factually and legally deficient.   For these reasons, Defendant respectfully requests that the Court grant final summary judgment under Rule 56 of the Federal Rules of Civil Procedure, and dismiss this case with prejudice.

**II**.

**FACTUAL BACKGROUND**

   Kroger hired Plaintiff as a Stocker in 2005.  (Exhibit A —Plaintiff's Deposition, pp. 34-35). Plaintiff worked at Houston Store 314, which is located on Buffalo Speedway. (Exhibit A, p. 34, ll. 20-24).   Initially, Plaintiff worked the overnight shift stocking groceries, but he was unable to maintain the speed required to timely complete his job duties. (Exhibit A, pp. 34-37).

   Plaintiff voluntarily transferred out of the stocker position after a few weeks and moved to a front-end sacker position. (Exhibit A, p. 37).   He worked as a sacker at Store 314 continually thereafter up until the date of his resignation on October 31, 2007.

**A. <u>Plaintiff's Open Heart Surgery in 2006</u>**

   On Labor Day in 2006, Plaintiff was working the morning shift when he began to feel tightness in his chest. (Exhibit A, pp. 49-50, p. 109).  Plaintiff called his wife to pick him up from

- 3 -

work and she took him to the hospital. (Exhibit A, p. 110).  Plaintiff was diagnosed with clogged arteries and underwent a quadruple bypass surgery the next day. (Exhibit A, pp. 110-111).

Plaintiff was in the hospital for approximately one month and was on leave from Kroger during this time. (Exhibit A, p. 111).  Upon Plaintiff's return to work, he was placed on light duty restrictions, which consisted of reduced hours performing light clean up work in the store. (Exhibit A, pp. 113-114).  A few months later, once Plaintiff obtained a full release from his doctor, he was moved back to the sacker position and restored to his prior schedule. (Exhibit A, p. 115, ll. 3-8).

**B.**     **Kroger's Investigation of Plaintiff in 2007**

Kroger rigorously audits its sales transactions to identify abnormalities or suspicious activity that warrant investigation. (Exhibit B—Cari Lucas Affidavit).  Through a computer system called MAX, the company automatically generates reports which are forwarded to risk management personnel in the field for investigation. (*Id.* at ¶2).  In this case, MAX identified suspicious activity on Plaintiff's Kroger Plus Card[2], and Risk Management Investigator Cari Lucas was assigned to investigate the matter. (*Id.*)  Specifically, Kroger identified a large number of pharmacy coupon credits, many of which occurred on the same day at different stores.  This pattern appeared to be an abuse of the system, as Kroger policy limited credits for employee households to one per week, and most coupons had similar restrictions on using multiple coupons at a time.

**1.**     **Kroger's Pharmacy Coupon Program**

Kroger and other pharmacies have long used marketing strategies whereby customers who bring in a new or transferred prescription receive a certain amount of store credit, usually between $5.00 and $30.00.  Until approximately August 2007, Kroger used gift cards as the method of

---

[2] Each of Kroger's customers, including its employees, are issued a "Plus Card" which consists of either a credit card or a small card that fits on a key chain. (Exhibit B, ¶3).  The cards have a UPC code, which is scanned each time the individual makes a purchase. (*Id.*)  When the cards are issued, the individual completes a form containing his or her name, address and other identifying information, which can then be used to track an individual's purchases, and link any suspected fraud to a particular customer. (*Id.*)  In addition, the Plus Card is used to provide employees a 10% discount on their purchases, and to store monetary credits for rebate programs like the pharmacy coupon program. (*Id.*)

providing store credit.  After that time, Kroger loaded the credit amounts onto a customer's Plus Card in lieu of providing a gift card.  The change in the program is outlined in Kroger's "RX Rewards Loyalty Playbook for Pharmacy Coupons and Promotions," which was issued to all pharmacy employees at Kroger in July 2007 in advance of the transition (Exhibit C—Rx Rewards Loyalty Playbook for Pharmacy Coupons and Promotions).

The Playbook contains certain general rules concerning the use of pharmacy rewards, one of which is that only "one coupon per household per week" can be redeemed. (*Id*. at EBG 217). Even before the playbook was issued, this rule had long been in place. (Exhibit B, ¶4).  Similarly, the Playbook provides that Kroger would follow any restrictions on the use of competitor coupons: "In the event a competitor places restrictions on their coupons, please follow the restrictions stated." (*Id*. at EBG 228).  For example, a $30.00 CVS coupon available during the relevant time period limits the customer to "one gift card per visit." (*Id*. at EBG 235).[3]

### 2.   Ramona Solovitz's Abuse of Kroger's Pharmacy Coupon Program

Cari Lucas reviewed the transaction data for Plaintiff's Plus Card beginning in July and noted that a large number of pharmacy coupons had been redeemed on the card. (Exhibit B, ¶4).  On several occasions, multiple coupons were redeemed on the same day, but at different stores, suggesting an attempt to circumvent Kroger's limits on coupon use.  Plaintiff, however, testified that it was his wife, Ramona Solovitz, who was redeeming the pharmacy coupons, and not him. (Exhibit A, p. 79).  When asked about his wife's activities at his deposition, Plaintiff conceded that his wife's activities looked suspicious, but that he had "no clue" what she was doing. (Exhibit A, p. 84, l. 6, p. 85, l. 7).

---

[3]   Plaintiff's wife, Ramona Solovitz, testified that she regularly used these $30.00 CVS coupons (Exhibit M—Deposition of Romona Solovitz, pp. 47-48), which is also reflected in Kroger's records  (Exhibit E—Kroger Plus Card Points Summary).

Below is a chart of the gift cards issued for prescription coupons on Plaintiff's Plus Card between July 16, 2007 and August 18, 2007.

| Date Issued | Issued at Store No. | Gift Card Value |
|---|---|---|
| 7/16/2007 | 363 | $20.00 |
| 7/17/2007 | 355 | $20.00 |
| 7/18/2007 | 740 | $20.00 |
| 7/18/2007 | 313 | $20.00 |
| 7/25/2007 | 314 | $20.00 |
| 7/25/2007 | 365 | $20.00 |
| 7/25/2007 | 735 | $20.00 |
| 7/30/2007 | 363 | $20.00 |
| 8/2/2007 | 313 | $20.00 |
| 8/2/2007 | 740 | $20.00 |
| 8/5/2007 | 243 | $20.00 |
| 8/13/2007 | 363 | $20.00 |
| 8/13/2007 | 243 | $20.00 |
| 8/15/2007 | 740 | $20.00 |
| 8/15/2007 | 314 | $20.00 |
| 8/15/2007 | 735 | $20.00 |
| 8/18/2007 | 243 | $20.00 |
| **TOTAL** | | **$340.00** |

(Exhibit D—Gift Card Data).  Similarly, the chart below summarizes dates and amounts credited to Plaintiff's Plus Card for prescription rewards issued after Kroger changed its program and discontinued the use of gift cards.

| **Date** | **Store No.** | **Amount Spent** | **Reward Amount** |
|----------|---------------|------------------|-------------------|
| 8/29/2007 | 363 | $0.00 | $30.00 |
| 9/22/2007 | 243 | $0.00 | $30.00 |
| 9/25/2007 | 313 | $0.00 | $30.00 |
| 10/1/2007 | 363 | $0.00 | $30.00 |
| 10/9/2007 | 355 | $0.00 | $30.00 |
| 10/9/2007 | 243 | $0.00 | $30.00 |
| 10/18/2007 | 313 | $0.00 | $30.00 |
| 10/23/2007 | 363 | $0.00 | $30.00 |
| **TOTAL** | | $0.00 | **$240.00** |

(Exhibit E).  In approximately ninety (90) days, Plaintiff received $580.00 in prescription rewards for twenty five (25) prescriptions at Kroger.  Plaintiff's wife testified that she was told of Kroger's policy limiting pharmacy coupons to one per week by a Kroger pharmacist (Exhibit M, pp. 53-54). She also admitted to regularly circumventing Kroger's rules by taking coupons to multiple stores.

Q.  That's a Kroger coupon.  Do you see that?

A.  Uh-huh.

Q.  And if you look in the fine print on that coupon, it says:  "One coupon per family per week."  Do you see that?

A.  Yes.

Q.  Isn't it true that most of the coupons that you used have limitations like that limiting to one per week or one per household?  Isn't that true?

A.  True.

Q.  Okay.  And that's why you went to different stores, because they wouldn't allow you to use multiple coupons at the same store, would they?

A.  No.

(Exhibit M, p. 67, l. 25, p. 68, l. 13)

In addition, it is undisputed that Plaintiff's wife was using Plaintiff's Plus Card to redeem coupons on prescriptions for family members who did not live in the same household. (Exhibit G—Statement of Lewis Solovitz).  Specifically, Plaintiff's wife redeemed coupons on Plaintiff's Plus Card for Plaintiff's brother in law and sister, who lived in a separate home, on Plaintiff's Plus Card. (Exhibit A, p. 95; Exhibit M, p. 56, ll. 14-18).   This was a clear violation of Kroger policy: "Scanning your card for purchase other than your own, including customers, friends or family members outside of your immediate household will result in disciplinary action up to and including IMMEDIATE TERMINATION and possible CRIMINAL PROSECUTION for fraud." (Exhibit F—Kroger Plus Card Policy).   By entrusting his wife with his Kroger Plus Card, Plaintiff was therefore responsible for any violations of Kroger policy in utilizing his card.

### 3.  Plaintiff Was Aware of His Wife's Fraudulent Reward Activity, As He Consistently Redeemed The Reward Credits Toward His Kroger Purchases

Plaintiff undoubtedly benefitted from his wife's use of his Plus Card in her fraudulent reward activity, as he used the same Plus Card to purchase groceries and other items at Kroger Store 314. (Exhibit D; Exhibit E).  Specifically, Kroger has evidence, including video footage, of Plaintiff using his Kroger Plus Card as cash for making purchases at Kroger, which Plaintiff did not deny (Exhibit A, pp. 99, 103; Exhibit D; Exhibit E).   In fact, Solovitz kept close track of his Plus Card cash balances, as he approached members of Kroger management ```on several occasions regarding variances in his Plus Card balances. (*Id.*, p. 101).  Lastly, Plaintiff conceded that his wife told him there was money in his Plus Card account.  (*Id.*, p. 99).   As such, Plaintiff, who consistently benefitted from the fraudulent activity on his Plus Card, cannot now claim that he did not know what his wife was doing.  Plaintiff either knew about his wife's activites or turned a willful and knowing blind eye to it.

C.      **Meeting Between Plaintiff and Risk Management Officer on October 31, 2007**

Cari Lucas came to Plaintiff's store on October 31, 2007 to interview him as part of her investigation into the suspicious transactions on Plaintiff's Plus Card. (Exhibit B, ¶5).  Lucas met with Plaintiff in a private management office away from the sales floor. (*Id.*)  The only persons present for the interview were Plaintiff, Lucas, Ryan Orbin--a witness, and Charles Mitchell--a Union Steward requested by Plaintiff. (Exhibit H—Lucas Report; Exhibit B, ¶6).

At the inception of the meeting, Lucas informed Plaintiff that his participation in the investigation was voluntary and he could leave at any time. (Exhibit B, ¶6).  Plaintiff signed an acknowledgment noting he had been informed of these and other rights before agreeing to the meeting. (Exhibit I—Interview Acknowledgment).

During the meeting Lucas presented the evidence of the suspicious Plus Card transactions to Plaintiff and asked him what he knew. (Exhibit B, ¶7).  Plaintiff claimed he knew nothing and that these transactions were all done by his wife. (*Id.*)  Lucas asked Plaintiff if he remembered signing Kroger's Plus Card policy prohibiting transactions for family members outside his household and he said "yes." (Exhibit A, p. 145, ll. 1-11).  Plaintiff then signed a voluntary confession admitting that his wife used Plaintiff's Plus Card to receive prescription rewards for his sister who "does not live with my wife and I." (Exhibit G).  Plaintiff further explained "I know this is wrong and is considered stealing." (*Id.*)  Plaintiff also signed a Restitution Agreement promising to repay $689.00 to Kroger and a form acknowledging his immediate resignation from Kroger. (Exhibit J—Restitution Agreement; Exhibit K—Resignation).  Plaintiff testified that he had the opportunity to consult with his Union Steward before signing the documents and that the Union recommended that he resign. (Exhibit A, pp. 45-46).  Kroger did not file any criminal charges against Plaintiff after accepting Plaintiff's resignation.

D.      **Plaintiff's Job Search After Resignation from Kroger**

Solovitz was unemployed for approximately two months following his resignation from Kroger. (Exhibit A, p. 172, ll. 20-23).  Plaintiff testified that he received an employment offer from Target in January 2008. (*Id.*)  Plaintiff's position at Target pays more money than Kroger, and has superior benefits.  (Exhibit A, pp. 59-60).

Neither Plaintiff nor his wife have any knowledge of  statements made by Kroger to any prospective employers (Exhibit A, p. 158, l. 2-25; Exhibit M, p. 77, ll. 13-16).   After the investigatory meeting that took place on Plaintiff's last day of employment, Plaintiff has no evidence, other than his own suspicions, that Kroger **ever** communicated with anyone about him, or made any statements that were untrue.

> Q:      Do you have any knowledge yourself, personal knowledge,
>         which means you heard it, you saw, that type of thing --
>
> A:      No.
>
> Q:      That anybody from -- let me finish, that anybody at Kroger
>         has ever said anything about you that is untrue?
>
> A:      To my knowledge, I did not hear it; but, again, after the fact,
>         after I got -- lost my job at Kroger, anything is possible.

(Exhibit A, p. 158, ll. 16-25, p. 159, ll. 19-25).

Kroger's reference policy provides that the only information released to prospective employers is the ex-employee's dates of employment. (Exhibit B, ¶10).   All references are conducted through a third party, and not Kroger employees. (*Id.*)  There is no evidence in the record of any deviations from Kroger's reference policy in this case.

- 10 -

## III.

## ARGUMENTS AND AUTHORITIES

### A.    STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that "[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505 (1986).  The burden is not on the moving party to produce evidence showing the absence of a genuine issue of material fact, rather, the "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986).[4]

---

[4] Once the moving party satisfies its summary judgment burden, the non-moving party may not rely on naked assertions of dispute, but must adduce admissible evidence creating a fact issue on each essential element of her claim.  See *Anderson*, 477 U.S. at 255-56; *Celotex*, 477 U.S. at 322-23.  The non-moving party must do more than simply show that there is some metaphysical doubt concerning material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986).  The non-moving party must set forth specific facts sufficient to raise a genuine issue for trial, not mere denials, vague allegations or legal conclusions  *Celotex*, 477 U.S. at 322-23; *Delta Computer Corp. v. Frank*, 196 F.3d 589, 590 (5th Cir. 1999).  Thus, the non-moving party must offer more than a mere scintilla of evidence supporting the essential elements of her claim.  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889, 110 S.Ct. 3177 (1990); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082 (5th Cir. 1994).  Conclusory sworn testimony, standing alone, "cannot create a genuine issue of material fact precluding summary judgment." *Davis*, 14 F.3d at 1109.  To overcome summary judgment, the non-moving party must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s]." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).  "While the court must take the evidence in the light most favorable to the plaintiff for purposes of defendant's summary judgment motion, the court need not accept unreasonable inferences based on conjecture or speculation."  *Yerardi's Moody Street Restaurant & Lounge, Inc. v. Board of Selectmen of the Town of Randolph*, 932 F.2d 89, 92 (1st Cir. 1991)(internal citations omitted).

**B.** **PLAINTIFF'S BREACH OF CONTRACT CLAIM MUST BE DISMISSED, BECAUSE IT IS PREEMPTED BY THE LABOR MANAGEMENT RELATIONS ACT ("LMRA"), AND BARRED UNDER TEXAS LAW**

**1.** **Plaintiff's Breach of Contract Claim is Preempted by the LMRA**

Although Plaintiff's Original Petition (hereinafter "Complaint")[5] does not specify the basis of his breach of contract claim, the only contract upon which Plaintiff may reasonably rely in this suit is the collective bargaining agreement ("Union Contract") between Kroger and the United Food and Commercial Workers Union ("the Union"), which governed Plaintiff's employment with Kroger at all relevant times.   (Exhibit L—Union Contract; Exhibit A, pp. 41-42).   As such, Plaintiff's breach of contract claim is preempted by the LMRA, and should be dismissed for failure to exhaust the grievance procedures provided for under the Union Contract.

Pursuant to Section 301 of the LMRA, an individual employee may bring a cause of action against his employer for breach of a collective bargaining agreement ("CBA"). 29 U.S.C. § 185. *DelCostello v. International Broth. of Teamsters,* 462 U.S. 151, 163, 103 S.Ct. 2281 (1983); *Daigle v. Gulf State Utilities. Co., Local Union Number 2286,* 794 F.2d 974, 977 (5th Cir. 1986).   Prior to initiating such suit against the employer, however, the employee must exhaust any grievance or arbitration procedures provided by the CBA.   *DelCostello*, 462 U.S. at 163; *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652, 85 S.Ct. 614 (1965) ("As a general rule, in cases in which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedures agreed upon by employer and union as the mode of redress.").   Courts have found "[t]he law [to be] completely clear that employees may not

---

[5] On July 28, 2009, without either seeking Defendant's written consent or this Court's leave, Plaintiff filed a First Amended Complaint.   The same day, Defendant notified Plaintiff's counsel, in writing, that the First Amended Complaint fails to comply with Rule 15(a)(2) of the Federal Rules of Civil Procedure, which allows for pleading amendments "only with opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2).   Prior to filing the present motion, Defendant's attempts to resolve this issue with Plaintiff's counsel have been unsuccessful, as Ms. Adjua Umoja-Justice is unresponsive.   As such, Defendant refers to Plaintiff's Original Petition throughout its Motion for Summary Judgment, because it is the live pleading.

resort to state tort or contract claims in substitution for their rights under the grievance procedure in a collective bargaining agreement."[6]  *Strachan v. Union Oil Co.,* 768 F.2d 703, 704 (5th Cir. 1985); *see also Ross v. Runyon,* 858 F.Supp. 630, 634 (S.D.Tex., 1994) ("Before bringing suit, the employee must at least attempt to exhaust the grievance and arbitration procedures established by the bargaining agreement.")

According to Article 6 of the Union Contract governing Plaintiff's employment with Kroger, Solovitz's exclusive remedy for resolving a dispute with Kroger was to file a grievance with the Union concerning Kroger's action(s).   *See* Exhibit L, pp. 5-6.   In his deposition, Plaintiff acknowledged his understanding that if Kroger was treating him unfairly in any way, he "had a right to pursue [his] rights under this Collective Bargaining Agreement." (Exhibit A, p. 47).   Plaintiff similarly admitted that he never filed a grievance with the union following his resignation of employment to address the complaints raised in the instant action. (Exhibit A, p. 47, pp. 151-152).

By failing to file a grievance with the Union and to exhaust his exclusive remedies under the Union Contract, Plaintiff has thereby waived his right to pursue his breach of contract claim.  *See Hines v. Anchor Motor Freight, Inc.,*  424 U.S. 554, 563, 96 S.Ct. 1048 (1976) ("unless [the bargaining unit employee] attempted to utilize contractual procedures for settling his dispute with his employer, his independent suit against the employer in district court would be dismissed"); *Parham v. Carrier Corp.*, 9 F.3d 383, 392 (5th Cir. 1993) (rendering a take-nothing judgment against plaintiff on his breach of collective bargaining agreement claims, for failure to invoke the grievance procedures required under the CBAs).

---

[6] Although courts have recognized an exception to the requirement that employees exhaust grievance or arbitration procedures in situations in which the union has breached its duty of fair representation in handling the employees' grievances, such exception is inapplicable here, as Plaintiff has not alleged a breach of Union's duty of fair representation. *See Bui v. Nailor Industries of Tex., Inc.,* No. 05-04350, 2006 WL 1900626, at *3 (S.D.Tex., July 11, 2006) (dismissing plaintiffs' action for breach of the CBA, because Plaintiffs failed to exhaust the grievance and arbitration procedures set forth in the CBA, and because Plaintiffs had not made any assertion or showing that the Union breached its duty of fair representation).

**2.      Plaintiff Cannot Establish a Genuine Issue of Material Fact Regarding the Formation Of Any Other Contract That Would Satisfy Texas Law.**

Lastly, any claim that Plaintiff had some other agreement in addition to the Union Contract fails as a matter of law.  In his deposition, Plaintiff acknowledged that (1) he never entered into a written contract with anyone at Kroger, (2) he did not recall any supervisor or manager at Kroger telling him that Kroger was limited in any way in its ability to terminate him, and (3) no one ever promised him that he would not be fired. (Exhibit A, pp. 153-156).[7]

Q:      Okay.  You didn't have a contract or anything that protected you from being fired, did you?

A:      I mean, they have the – they have the right to put me to another store if there's an opening, yeah.

Q:      But – but you – you don't – you're not claiming that you had a contract with Kroger –

A:      Oh no.

Q:      --that prevented Kroger from firing you?

A:      No.  I don't believe there were any kind of contract – any kind like that around.

 (Exhibit A, p. 156, ll. 12-21).

Although Plaintiff does claim he was told that if he did his job well, he would always have a job at Kroger,[8] the alleged promise claimed by Plaintiff is insufficient to modify his at-will relationship.  Although Kroger has admittedly entered into a contract modifying Plaintiff's at-will status (*i.e.* the Union Contract),  Plaintiff claims there was a second verbal contract restricting Kroger's right to terminate his employment.  Under Texas law, however, general statements about

---

[7] It is also important to note that it is undisputed that Plaintiff voluntarily resigned from Kroger, after consulting with his union representative, and was not terminated (Exhibit K; Exhibit A, pp. 45-46).

[8] Specifically, Plaintiff testified that he was told, "you come to work every day, clean – you know, come – come and work presentable and you're doing your job right and we ask you to do something and you do whatever needs to be done, you'll have a job always at Kroger." (Exhibit A, p. 155).

job security do not create a contract.

> General statements like those made to Brown simply do not justify the conclusion
> that the speaker intends by them to make a binding contract of employment. For such
> a contract to exist, the employer must unequivocally indicate a definite intent to be
> bound not to terminate the employee except under clearly specified circumstances.
> General comments that an employee will not be discharged as long as his work is
> satisfactory do not in themselves manifest such an intent. Neither do statements that
> an employee will be discharged only for "good reason" or "good cause" when there
> is no agreement on what those terms encompass. Without such agreement the
> employee cannot reasonably expect to limit the employer's right to terminate him. An
> employee who has no formal agreement with his employer cannot construct one out
> of indefinite comments, encouragements, or assurances.

*Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998).

As such, the only contract upon which Plaintiff may base his breach of contract claim is the

Union Contract.  Since he has failed to exhaust his exclusive remedies under the Union Contract by

filing a grievance with the Union, Plaintiff has therefore waived his right to pursue a breach of

contract claim.  Accordingly, Plaintiff's breach of contract claim against Kroger  should be

dismissed.

**C.    PLAINTIFF'S WRONGFUL TERMINATION CLAIM FAILS AS A MATTER OF LAW    BECAUSE
NO SUCH GENERAL CLAIM EXISTS UNDER FEDERAL OR STATE LAW.**

In his Complaint, Plaintiff asserts a cause of action for wrongful termination. Plaintiff

cannot state a claim under state law, as Texas law does not recognize a general cause of action for

"wrongful termination."   Rather, in Texas, employment is terminable at the will of either the

employer or the employee, with or without cause, unless there is an express agreement to the

contrary.[9]  *Federal Exp. Corp. v. Dutschmann,* 846 S.W.2d 282, 283 (Tex. 1993).  The only

common law exception to this doctrine arises under *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d

733, 735 (Tex. 1985), which is inapplicable and has not been plead in the instant case.

---

[9] Since Plaintiff's employment with Kroger was governed by a Collective Bargaining Agreement, to the extent
Plaintiff's wrongful termination cause of action is premised on or linked to any alleged breach of contract, please see
Section IV.B above.

Although Plaintiff's Complaint is vague with respect to the basis for Plaintiff's wrongful termination claim, Plaintiff does allege that "the true reason that [he] was fired was because of his medical issues." *See* Plaintiff's Original Petition, ¶22.  To the extent Plaintiff is attempting to allege disability discrimination in violation of the Americans with Disabilities Act ("ADA") or Chapter 21 of the Texas Labor Code, such claim must fail, as Plaintiff never filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC") and/or the Texas Workforce Commission ("TWC") alleging disability discrimination.  *See Dao v. Auchan Hypermarket,* 96 F.3d 787, 789 (5th Cir. 1996) (prior to bringing suit against an employer for violation of the ADA, the employee must first file a timely administrative charge with the EEOC alleging disability discrimination); *Schroeder v. Texas Iron Works, Inc.* 813 S.W.2d 483, 488 (Tex. 1991) (under Texas statutory law, in order to file an action in Texas state court under the Texas Commission on Human Rights Act for disability discrimination, plaintiff must exhaust his administrative remedies before he could file suit.).  Therefore, Plaintiff cannot assert a claim for disability discrimination, under either federal or state law, as he has failed to exhaust his administrative remedies. *See Cilauro v. Thielsch Engineering, Inc.*, 123 Fed.Appx. 588, 589 (5th Cir. 2005) (upholding summary judgment on plaintiff's disability discrimination claim, because he "failed to exhaust his administrative remedies by filing a disability discrimination charge with the Equal Employment Opportunity Commission and/or with the Texas Commission on Human Rights.").

In sum, Plaintiff cannot state a common law claim for wrongful termination under Texas law, and has not exhausted his remedies for a statutory claim based on disability discrimination. Therefore, summary judgment on this cause of action is appropriate.

**D.**     **PLAINTIFF'S DEFAMATION CLAIM SHOULD BE DISMISSED BECAUSE ALL OF DEFENDANT'S COMMUNICATIONS REGARDING PLAINTIFF WERE PROTECTED BY PRIVILEGE.**

To maintain a defamation cause of action, Solovitz must prove that Kroger (1) published a statement; (2) that was defamatory concerning the Plaintiff; (3) while acting with negligence concerning the truth of the statement. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). Truth is a complete defense to defamation. *See Tex. Civ. Prac. & Rem. Code Ann.* §73.005 (Vernon 1997); *Milam v. Nat'l Ins. Crime Bureau*, 989 S.W.2d 126, 130 (Tex. App.—San Antonio 1999). In his Complaint, Plaintiff alleges that his defamation claim stems from Kroger's alleged statements to third parties that he "had been fired for stealing from the Defendant." *See* Plaintiff's Original Petition, ¶26. When asked about the basis of his defamation claim in his deposition, Plaintiff could not identify one untrue statement made about him by anyone at Kroger.[10] (Exhibit A, pp. 157-159). The only statements made by Kroger concerning the circumstances of Plaintiff's resignation of which Plaintiff has firsthand knowledge are (a) the statements made during the investigation meeting with Risk Management on October 31, 2007; and (b) the statements made by Kroger to the Texas Workforce Commission ("TWC") in defense of Plaintiff's unemployment claim. It is well established under Texas law, that Kroger, as the employer, has a qualified privilege to make the statements in question. Accordingly, Plaintiff's defamation claim should be dismissed.

---

[10] Plaintiff testified that he based his defamation claim, in part, on "the fact that it took [him] quite a long time to find another job" and his "sense" that Michael Marino, a Co-Manager, was in an adjoining office listening in on his investigation meeting with Risk Management. (Exhibit A, pp. 159-167). Such allegations are not supported by any concrete factual evidence, and as such, are nothing more than speculation and assumption, which cannot form the basis of Plaintiff's defamation claim. *See Donahue v. Melrose Hotel*, No. 95-2630, 1997 WL 148012, at *12 (N.D.Tex. March 26, 1997) (plaintiff's conclusory allegations that he did not receive job offers because of negative statements made about him by former employer, without any supporting evidence of what was said, by whom and to whom, are "hearsay and purely speculative and are insufficient to establish the elements of slander or defamation as a matter of law.").

1.    **Kroger's Communications With the Texas Workforce Commission Are Absolutely Privileged.**

Kroger's statements to the Texas Workforce Commission in response to Plaintiff's application for unemployment compensation cannot form the basis of a defamation claim, as such statements are absolutely privileged. Pursuant to Texas Labor Code § 301.074, oral and written statements made to the TWC are absolutely privileged and cannot be the subject of a defamation claim. *See* Texas Labor Code §301.074; *see also Hardwick v. Houston Lighting & Power Co.,* 881 S.W.2d 195, 198 (Tex.App.—Corpus Christi, 1994) (statements made to the employment commission are absolutely privileged, as are statements made at a judicial or quasi-judicial hearing, and do not constitute publication in an action for slander). Accordingly, to the extent Plaintiff's defamation claim stems from Kroger's statements made during the TWC unemployment hearing, the claim must fail as a matter of law.

2.    **Statements Made During the Risk Management Investigation Are Qualifiedly Privileged.**

Similarly, a defamation claim premised on statements made during the Risk Management investigative interview must fail as a matter of law, because such statements are protected by qualified privilege. Under Texas law, "a qualified privilege exists when an employer publishes allegedly defamatory remarks regarding an employee to a person having a corresponding interest or duty in the matter to which the communication relates." TEX. LAB. CODE § 103.001-.004 (Vernon's 2006); *Garcia v. Burris,* 961 S.W.2d 603, 606 (Tex. App.—San Antonio 1997, *pet. denied*). "Accusations or comments about an employee by his employer, made to a person having an interest or duty in the matter to which the communication relates, have a qualified privilege." *ContiCommodity Servs., Inc. v. Ragan,* 63 F.3d 438, 442 (5th Cir. 1995) (citing *Schauer v. Memorial Care Sys.,* 856 S.W.2d 437, 449 (Tex.App.—Houston 1993)), *cert. denied,* 517 U.S. 1104, 116 S.Ct. 1318, 134 L.Ed.2d 471 (1996). This privilege is grounded in "strong public policy

considerations" and is deemed "vital to our system of criminal justice." *Zarate v. Cortinas*, 553 S.W.2d 652, 655 (Tex. Civ. App.—Corpus Christi 1977, *no writ*). Whether a conditional or qualified privilege exists is a question of law for the court. *Rodriguez v. Wal-Mart Stores, Inc.*, 52 S.W.3d 814, 822 (Tex. 2002) *rev'd in part on other grounds* 92 S.W.3d 502 (Tex. Oct. 10, 2002); *Dollar v. Georgia-Pacific Corp.,* 59 F.3d 1242 (5th Cir. 1995); *E. Tex. Med. Ctr. Cancer Inst. v. Anderson*, 991 S.W.2d 55, 60 (Tex.App.-Tyler 1998, pet. denied).

In the instant case, Plaintiff alleges that he was falsely accused of theft by Kroger's Risk Management Investigator, Cari Lucas, during an investigation interview on October 31, 2007. This interview was witnessed by Ryan Orbin, Kroger Grocery Associate, and Union Steward Charles Mitchell, whose presence was requested by Plaintiff. (Exhibit A, p. 159). Orbin was a witness for the Company, and Mitchell was the representative of the Plaintiff (Exhibit B, ¶6). Since all of the individuals present at the investigation interview meeting had a corresponding interest in the matter discussed, qualified privilege applies to the communications during that meeting.

In *Randall's Food Markets, Inc. v. Johnson,* a well-cited decision on the issue of qualified privilege as it applies to statements made during employer investigations, the Supreme Court of Texas considered similar circumstances and upheld dismissal of plaintiff's slander claim, finding the statements in question to be qualifiedly privileged. 891 S.W.2d 640, 646 (Tex. 1995). In that case, a former Randall's employee was investigated based on suspicions of internal theft and questioned as part of the investigation. *Id.* The employee sued Randall's for defamation stemming from the statements made by Randall's employees during the investigation of her alleged theft. *Id.* The court upheld dismissal of the employee's defamation claim, finding that the qualified privilege applied to the statements in question. *Id.*

Similarly, in this case, any complained of statements made by Cari Lucas during the course of the investigation were privileged, and cannot serve as the basis of Plaintiff's defamation claim. *See id.; Cuellar v. Walgreens Co.,* No. 13-00-594, 2002 WL 471317, at * 5 (Tex.App.-Corpus Christi, March 28, 2002) (upholding summary judgment on employee's defamation claim, as statements made by employer's investigators during the investigation were qualifiedly privileged); *Bergman v. Oshman's Sporting Goods, Inc.,* 594 S.W.2d 814, 816 (Tex.Civ.App.-Tyler 1980, no writ) ("Accusations against an employee by his employer or another employee, made to a person having a corresponding interest or duty in the matter to which the communication relates, are qualifiedly privileged.").

Accordingly, Plaintiff's defamation claim based on any statements uttered during the investigation interview must be dismissed as qualifiedly privileged, unless Plaintiff can defeat this privilege.

              (a)        <u>Plaintiff Cannot Establish Actual Malice As Required to Defeat the Qualified Privilege.</u>

To defeat a defense of privilege, Plaintiff must prove that "the defendant's statements were actuated, inspired or colored by actual or express malice, existing at the time of publication, or some evil motive or bad faith." *Randall's,* 891 S.W.2d at 646. Qualifiedly privileged communications are presumed under the law to have been made in good faith and without malice. *Bolling v. Baker,* 671 S.W.2d 559, 564 (Tex. App.—San Antonio 1984, *writ dism'd w.o.j.*), *cert. denied,* 474 U.S. 824 (1985). Moreover, to defeat summary judgment, the plaintiff must show actual malice, rather than the defendant establish absence of malice. *See Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 314 (5th Cir. 1995). Plaintiff has not and cannot meet his burden in this regard.

Malice is defined as "the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true." *Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex. 1989). In this

context, a determinative factor is whether Kroger entertained serious doubts as to the truth of the communication(s) in question; the privilege is not lost if Kroger, or Cari Lucas, actually believed the defamatory statement(s) to be true.  *See Halbert v. City of Sherman, Texas*, 33 F.3d 526, 530 (5th Cir. 1994) (falsity of allegedly defamatory statement is by itself insufficient to show actual malice). Plaintiff has neither alleged nor implied that Cari Lucas, or anyone at Kroger, entertained any doubts as to the statements made during the course of the investigation, deliberately ignored contrary evidence or otherwise sought to avoid the truth.

As an initial matter, Risk Management Investigator Cari Lucas had no prior knowledge of Plaintiff prior to conducting this investigation, which was initiated based on MAX's identification of suspicious activity on Plaintiff's Kroger Plus Card.  (Exhibit A, p. 133; Exhibit B, ¶3).  Upon notification from MAX, Cari Lucas engaged in a thorough investigation which led Ms. Lucas to reasonably conclude that Plaintiff (or someone on his behalf) had engaged in fraudulent activity using his Kroger Plus Card.  Ms. Lucas never entertained any doubts as to the statements made during the investigation, and Plaintiff signed a confession admitting that his actions were a violation of Kroger policy. (Exhibit B, ¶8).  Moreover, Plaintiff's wife has admitted that she used Plaintiff's Plus Card for prescription rewards belonging to persons outside Plaintiff's household (Exhibit M, p. 56,  ll. 14-18), and to redeem pharmacy coupons more often than the limits allowed by Kroger (Exhibit M, pp. 53-54).  Although Plaintiff may now argue that neither he nor his wife ***intended*** to do wrong, that is irrelevant as there is no genuine issue of material fact regarding whether the underlying misconduct actually occurred as accused by Kroger.

Where, as here, an employer performs an investigation that leads to circumstantial evidence of guilt, and there is no indication that the employer in fact doubts the truth of the charge, no finding of actual malice is possible. *See Frakes v. Crete Carrier Corp.*, No. 08-10603, 2009 WL 2450694,

at *5 (5th Cir. Aug. 12, 2009) (allegation that employer's investigation was inadequate and potentially negligent was insufficient to support a finding of actual malice); *Duffy*, 44 F.3d at 316 ("[a]lthough [defendant] may well have been hasty or ultimately mistaken in its decision," plaintiff's complaint that the investigation was inadequate, by itself, is insufficient to show actual malice); *Halbert,* 33 F.3d at 527 (falsity of allegedly defamatory statement is by itself insufficient to show actual malice).

In this case, Plaintiff confessed to alleged wrongdoing and resigned after consulting with his Union representative.  Faced with a record where both the Plaintiff and his Union accepted Kroger's findings, Plaintiff cannot now claim the accusations to be malicious.  Since Plaintiff cannot provide this Court with even a scintilla of evidence to support a finding of actual malice, the statements in question are protected by qualified privilege, and cannot form the basis of Plaintiff's defamation claim.  Therefore, Plaintiff's defamation claim must be dismissed.

**E.   PLAINTIFF'S CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS FAILS AS  A MATTER OF LAW.**

Plaintiff's intentional infliction of emotional distress ("IIED") claim duplicates the facts supporting his other claims, and is therefore barred under Texas law.  The factual allegations upon which this claim relies are the same as those supporting his wrongful termination, breach of contract, defamation, slander and libel claims.  Moreover, Plaintiff is unable to satisfy the elements of an intentional infliction of emotional distress cause of action, as the alleged conduct does not rise to the level of "extreme and outrageous" conduct required for an actionable IIED claim.

**1.    Plaintiff's Intentional Infliction of Emotional Distress Claim Is Not Acting As A "Gap-Filler."**

The Texas Supreme Court has stated that the tort of intentional infliction of emotional distress is a "gap-filler" tort, designed for the "limited purpose of allowing recovery in those rare instances" where emotional distress has been intentionally inflicted and the "victim has no other

recognized theory of redress." *Hoffmann-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004). Plaintiff's Complaint does not present separate allegations upon which Plaintiff's IIED claim rests. Instead, the IIED claim is based on the same factual allegations as those supporting Plaintiff's claims of wrongful termination, breach of contract, defamation, slander and libel. Because Plaintiff's other claims afford him a remedy for any resulting emotional distress, there is no gap left to fill with an IIED cause of action. *Moser v. Roberts*, 185 S.W.3d 912, 916 (Tex. App. 2006) (tort of IIED was unavailable to plaintiff, because her claims for slander and libel afforded her a remedy for any resulting emotional distress); *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 (Tex. 2005) (where plaintiff's allegations are covered by other existing causes of action, he "cannot assert them as intentional infliction claims [even where] those avenues may . . . be barred"). The factual basis for Plaintiff's other claims and IIED is the same, so the intentional infliction of emotional distress claim is not acting as a gap-filler and Kroger is entitled to summary judgment.

### 2. Plaintiff Fails to Satisfy the Required Elements of an IIED Claim.

Even assuming, *arguendo,* that the gravamen of Plaintiff's claim of IIED was not of the type meant to be covered by Plaintiff's other causes of action, Plaintiff's claim for IIED would, nonetheless, fail as he cannot satisfy the necessary elements. To recover for intentional infliction of emotional distress, Plaintiff must prove that: (1) Kroger acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) Kroger's actions caused Plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Standard Fruit & Vegetable Co., Inc. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998); *Hoffmann-La Roche, Inc.*, 144 S.W.3d at 438.

The conduct about which Plaintiff complains was not extreme and outrageous as a matter of law. To meet this element, the conduct must be so outrageous and extreme as "to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex. 1993). The threshold for proving

"extreme and outrageous" conduct is a high one; it should be found 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993).  The issue of whether Kroger's conduct is extreme and outrageous is a question of law. *Wornick*, 856 S.W.2d at 734 (Tex. 1993) (it is for the court to determine "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery....").

    Although Complaint fails to allege that any of the complained of conduct was "extreme and outrageous," to the extent Plaintiff's IIED claim relies on his allegations pertaining to Kroger's investigation into Plaintiff's fraudulent use of the Kroger Plus Card, Kroger's actions did not rise to the level of extreme and outrageous conduct sufficient to sustain a claim for IIED.  In the workplace, while an employer's conduct might in some instances be unpleasant, the employer must have some discretion to "supervise, review, criticize, demote, transfer, and discipline" its workers. *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 612 (Tex. 1999).  Accordingly, Texas courts have declined to recognize IIED claims for "ordinary employment disputes," including claims involving internal investigations of employee theft, emphasizing that extreme conduct in this context "exists only in the most unusual of circumstances."  *Id*. at 612-13; *see, e.g., Randall's,* 891 S.W.2d at 644 (determining that investigation of employee's alleged theft was not extreme and outrageous even though employer questioned employee in a severe tone, did not explain facts, and asked employee how she could have neglected to pay for the alleged stolen item when she paid for other groceries); *See Wornick*, 856 S.W.2d at 734 (holding that ordering employee to immediately leave the premises and having security guard escort employee out did not rise to the level of extreme and outrageous conduct);  *Southwestern Bell Mobile Sys., Inc. v. Franco,* 971 S.W.2d 52, 54 (Tex. 1998) (holding

that even wrongful termination is not extreme and outrageous conduct); *Wilson v. Monarch Paper Co.,* 939 F.2d 1138, 1143 (5th Cir. 1991) ("except in the – most unusual cases, even illegal, discriminatory, or malicious conduct, as deplorable as it sometimes may be, is not 'extreme and outrageous.'").

In the instant case, other than claiming he was threatened with arrest, Plaintiff has not alleged that he was mistreated, assaulted, restrained, or even subjected to profane language during the course of his investigation meeting.  In fact, Plaintiff has conceded that, he was allowed Union representation and that, during the Risk Management investigation interview, Lucas was at all times courteous to Plaintiff, and never cursed or used profanity. (Exhibit A, p. 132).  In a similar case, the Texas Court of Appeals upheld summary judgment on an employee's IIED claim, wherein the employee testified that during the two-hour investigation into the employee's alleged theft, the investigator, who threatened the employee with arrest if she did not confess, was "calm" and did not physically threaten or restrain the employee, and allowed the employee to walk out of the store.  *See Cuellar*, 2002 WL 471317,  at *6.  Accordingly, viewing the evidence in the light most favorable to Plaintiff, Kroger's conduct in investigating the alleged misuse of Plaintiff's Kroger Plus Card and threatening to arrest him, though understandably unpleasant for Plaintiff, was in the nature of an "ordinary employment dispute" and did not rise to the level of extreme and outrageous conduct sufficient to sustain a claim for IIED.  Kroger is, therefore, entitled to summary judgment, as a matter of law, on Plaintiff's claim of intentional infliction of emotional distress.

### III.

### CONCLUSION

For all of the foregoing reasons, Kroger respectfully requests that the Court grant final summary judgment on all of Plaintiff's claims in this lawsuit, and whatever other relief to which it may be justly entitled.

Respectfully submitted,

EPSTEIN BECKER GREEN WICKLIFF & HALL, P.C.

By:      s/David L. Barron
        David L. Barron
        Attorney-in-Charge
        State Bar 00797678
        Greta Ravitsky
        State Bar 24058063
        1000 Louisiana, Suite 5400
        Houston, Texas  77002
        Telephone: (713) 750-3100
        Facsimile: (713) 750-3101

**ATTORNEYS FOR DEFENDANT**

**<u>CERTIFICATE OF SERVICE</u>**

     I hereby certify that a true and correct copy of the foregoing ***Defendant's Motion for Summary Judgment*** has been served via first class mail and facsimile, on this 19th day of October, 2009 to Plaintiff's counsel of record as follows:

        Adjua Umoja-Justice, J.D.
        The Justice Law Firm
        117 West Hamilton Street
        Houston, Texas 77076
        **CERTIFIED MAIL RRR #7006 2150 0000 3275 6488**
        **ELECTRONIC MAIL NOTIFICATION**

        s/David L. Barron
        David L. Barron

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LEWIS SOLOVITZ | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-09-0343 |
| | § | |
| | § | |
| THE KROGER CO., INC. | § | |
| | § | |
| Defendant | § | |

## INDEX OF SUMMARY JUDGMENT EVIDENCE

Exhibit A        Plaintiff's Deposition, dated July 28, 2009

Exhibit B        Affidavit of Cari Lucas

Exhibit C        Kroger Rx Rewards Loyalty Playbook for Pharmacy Coupons
and Promotions

Exhibit D        Records pertaining to Gift Card Data

Exhibit E        Kroger Plus Card Points Activity

Exhibit F        Plaintiff's Kroger Plus Card Policy and Acknowledgment,
signed by Plaintiff

Exhibit G        Plaintiff's Voluntary Statement, dated October 31, 2007

Exhibit H        Risk Management Investigative Incident Report

Exhibit I        Plaintiff's Risk Management Investigative Interview
Acknowledgment, dated October 3, 2007

Exhibit J        Plaintiff's Restitution Agreement, dated October 31, 2007

Exhibit K        Plaintiff's Resignation, dated October 31, 2007

Exhibit L        Kroger Union Contract – Collective Bargaining Agreement
between Kroger and the United Food and Commercial
Worker's Union

Exhibit M        Deposition Transcript of Ramona Solovitz, dated September
                 30, 2009

## <u>TABLE OF CONTENTS</u>

I.   SUMMARY OF ARGUMENT…………...............................................................1

II.  FACTUAL BACKGROUND…………...............................................................3

   A.   Plaintiff's Open Heart Surgery in 2006 ........................................................3

   B.   Kroger's Investigation of Plaintiff in 2007 ...................................................4

      1.   Kroger's Pharmacy Coupon Program ...................................................... 4
      2.   Ramona Solovitz's Abuse of Kroger's Pharmacy Coupon Program...................... 5
      3.   Plaintiff Was Aware of His Wife's Fraudulent Reward Activity, As He ..............
         Consistently Redeemed The Reward Credits Toward His Kroger Purchases ........ 8

   C.   Meeting Between Plaintiff and Risk Management Officer on October 31, 2007........... 9

   D.   Plaintiff's Job Search After Resignation from Kroger ................................. 10

III. ARGUMENTS AND AUTHORITIES…………..............................................11

   A.   Standard for Summary Judgment ................................................................11

   B.   Plaintiff's Breach of Contract Claim Must Be Dismissed, Because It Is
      Preempted  by the Labor Management Relations Act ("LMRA"), and
      Barred Under Texas Law…………...........................................................12

      1.   Plaintiff's Breach of Contract Claim is Preempted by the LMRA ........................ 12
      2.   Plaintiff Cannot Establish a Genuine Issue of Material Fact Regarding the .............
         Formation Of Any Other Contract That Would Satisfy Texas Law..................... 14

   C.   Plaintiff's Wrongful Termination Claim Fails As a Matter of Law
      Because No Such  General Claim Exists under Federal or State Law........................15

   D.   Plaintiff's Defamation Claim Should Be Dismissed Because All of
      Defendant's  Communications Regarding Plaintiff Were Protected by
      Privilege. .....................................................................................17

      1.   Kroger's Communications With the Texas Workforce Commission Are ................
         Absolutely Privileged................................................................ 18
      2.   Statements Made During the Risk Management Investigation Are Qualifiedly .......
         Privileged. ......................................................................... 18

        (a)  Plaintiff Cannot Establish Actual Malice As Required to Defeat the  Qualified
           Privilege. ..................................................................... 20

   E.   Plaintiff's Claim of Intentional Infliction of Emotional Distress Fails As A Matter of
      Law. ..........................................................................................22

1.   Plaintiff's Intentional Infliction of Emotional Distress Claim Is Not Acting As A. "Gap-Filler." ........................................................................................ 22

2.   Plaintiff Fails to Satisfy the Required Elements of an IIED Claim. .................... 23

III.   CONCLUSION…………………………….................................................................25