LEWIS SOLOVITZ

**COPY**

1

1     IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF TEXAS
2              HOUSTON DIVISION

      LEWIS SOLOVITZ              )
3                                )
      VS.                        ) CIVIL ACTION NO.
4                                )      H-09-0343
      THE KROGER CO., INC.       )
5

6

7

8

9

10

11         ORAL AND VIDEOTAPED DEPOSITION OF

12                  LEWIS SOLOVITZ

13                  JULY 28, 2009

14

15

16         **DEFENDANT'S EXHIBIT A**

17

18

19  ORAL AND VIDEOTAPED DEPOSITION OF LEWIS SOLOVITZ,
    produced as a witness, duly sworn by me at the instance
20  of the Defendant, taken in the above-styled and numbered
    cause on July 28, 2009, from 10:12 a.m. to 4:01 p.m.,
21  before Mylinda Tubbs Faircloth, Certified Shorthand
    Reporter No. 2896 in and for the State of Texas, via
22  machine shorthand, at the offices of Epstein Becker
    Green Wickliff & Hall, P.C., 1000 Louisiana, Suite 5400,
23  Houston, Texas  77002, pursuant to the Federal Rules of
    Civil Procedure and any provisions stated on the record.
24

25

LEWIS SOLOVITZ

1   I said, I wouldn't even consider even doing that.  I

2   mean, you're my buddy.  You're my friend.  We go out.  I

3   mean, we do things together.  Why would I want to do

4   that to your wife?

10:44   5       Q.   Okay.

6       A.   But that -- that's -- but, like I said, she --

7   she threatened him, the store manager, that if you don't

8   let him go, I'm going to do something.  So, I guess,

9   hearing that he said I have no choice but to terminate

10:45   10  you.  I don't want to.  You're a good worker, you're a

11  hard -- everybody likes you, the customers like you, and

12  you will be missed.

13      Q.   Okay.  Your next job was Kroger?

14      A.   The next job was Kroger.

10:45   15      Q.   All right.  Which -- which store were you

16  hired at?

17      A.   The -- the one on Westpark and -- oh, me.

18  Which one was it?  It's the one on Westpark.

19      Q.   Okay.

10:45   20      A.   And, like, on Southwest Freeway.  Oh, Buffalo

21  Speedway.  That's it, Buffalo Speedway.

22      Q.   Is that 314?  Do you remember the store

23  number?

24      A.   I think it was something 14.

10:45   25      Q.   Okay.  And you were hired as a sacker?

LEWIS SOLOVITZ

1      A.    I was hired as a sacker, yes, I was.

2      Q.    Okay.  On your interrogatories, you say

3  sacker/stocker.  Did you also do stocker duties from

4  time to time or --

10:45   5      A.    When I first started working there, I was

6  actually hired as a stocker.  And when I was working

7  there as a stocker, I wasn't familiar of how they

8  stocked.  I was always familiar about how they were

9  doing things in Belden's, and I would read the label to

10:46  10  know where things were located, but they weren't reading

11  the labels on the box.  They were reading the label that

12  was on the -- the shelf, and I said, I can't find the --

13  it's going to take me a long time to get used to that

14  and to find the product.

10:46  15            I said, you -- you all know where, okay,

16  it goes here, it goes here, it goes here; but I won't

17  know that because I'm not familiar with it because the

18  label on the boxes at Belden's said, okay, it goes on

19  this aisle, this place, this shelf, this -- and I was

10:46  20  used to it.  So, I got to a point where I really wasn't

21  functioning because they had a time frame.  You had to

22  get it done at a certain time because even though it was

23  a 24-hour Kroger, it needed to be done before 8:00

24  o'clock so when the store gets busy, all the boxes will

10:47  25  be off the floor and not -- and I wasn't really fast

LEWIS SOLOVITZ

1    enough for that.  So, that's when I traded to go to

2    the -- be a sacker.

3         Q.    Okay.

4         A.    And --

10:47    5         Q.    And were you disciplined at all when you were

6    a stocker, or did you just transfer before --

7         A.    I --

8         Q.    -- it resulted in discipline?

9         A.    The reason why -- like I said, the reason why

10:47   10    I left being a stocker, I was -- I couldn't get to the

11    level they wanted me to be fast enough.

12         Q.    Okay.

13         A.    I mean, I -- I wasn't -- I wasn't trying not

14    to do it.  I just knew that the -- the function they

10:47   15    wanted me to have, I wasn't being able to do it.

16         Q.    Okay.  So, you don't think you would have been

17    able to meet the -- the requirements to be a stocker?

18         A.    I don't know if I was -- could or couldn't.

19    It was -- if -- if -- but I just -- they wasn't

10:48   20    satisfied, the -- the pace, you know -- you know, you

21    came in at a certain time, or you worked overnight, and

22    I really wasn't crazy about working overnight because

23    I'm leaving my -- again, leaving my wife home alone

24    overnight.  I -- I didn't really feel comfortable about

10:48   25    that.  So, I knew if I worked sacker, at least I'll have

LEWIS SOLOVITZ

1   a day job.  If I had to work nights, it won't be no --

2   no later than 11:00 o'clock.  And she was all happy and

3   more for that.

4       Q.   Okay.

10:48   5       A.   Even though it was less pay.

6       Q.   How did you find out about the opening at

7   Kroger?

8       A.   I believe it was a job fair or just saw a sign

9   in -- in the door.  And I believe it was basically

10:48   10   the -- the one at the store because I just came in one

11   day, saw it, went on to the -- your machine.  Said you

12   do the application online, and did it.  And I guess in

13   about a week, they called me down, and I went to the

14   orientation.

10:49   15       Q.   Okay.  Was that -- was that a store that you

16   normally shop at or, no; or was it -- the Buffalo

17   Speedway store?

18       A.   The Buffalo Speedway was the one that I

19   applied for the job at.  The orientation was at a

10:49   20   different store.  That was the one on West Gray.

21       Q.   Okay.

22       A.   And I guess they probably had more people

23   going to the West Gray, instead of having two different

24   orientations on the same day.  They just squeezed it one

10:49   25   together.

LEWIS SOLOVITZ

1   remember -- I can't recall his last name.

2       Q.   Okay.  Was there one manager that you had more

3   contact with than with the others?  Would that have been

4   Mr. McKnight?

10:53   5       A.   Basically, all -- I was more talking to Mc --

6   Brian McKnight and Michael than Mr. Blum.

7       Q.   Okay.  Who made the schedule at the store; do

8   you recall?

9       A.   They had team leaders, and they would -- the

10:54   10  people that were the front end team leaders, they would

11  make the schedule.  And if you ask me who they were, I

12  don't remember.

13      Q.   That's fine.  Were you ever -- do you recall

14  ever being written up or disciplined at Kroger?

10:54   15      A.   I cannot recall being wrote -- written up for

16  anything.  I mean, I was always available for any shift,

17  Monday to Friday, even on weekends.  Came in when the

18  time was for me to be there, and I was -- vaguely ever

19  called in sick until I had my triple bypass surgery.

10:55   20      Q.   Were you a member of a union --

21      A.   That --

22      Q.   -- when you worked for Kroger?

23      A.   That, I was forced to sign.  I come from a

24  family that doesn't like unions, but this one I was told

10:55   25  that you had to sign.  If you wanted to work at Kroger,

1  you had -- you had to sign the paper if you wanted to

2  work at Kroger.

3      Q.  Who told you that; do you recall?

4      A.  The orientation person.

10:55  5      Q.  Someone from the union told you that or...

6      A.  They had -- they had the union people there

7  telling you.  In their own little ways, they sneak in

8  with words that -- okay, you better sign this paper or

9  we're out to get you.

10:55  10      Q.  Okay.  So, you -- you were afraid that if you

11  didn't sign up, then there might be repercussions from

12  that?

13      A.  Like I said, I signed the union paper because

14  I figured that would be the way to get my job.

10:56  15      Q.  Okay.

16      A.  I mean, I knew -- I knew that Texas is a

17  right-to-work state, but why they had a union, I don't

18  know why.  But I knew that Kroger is a -- a scattered

19  company in different states.  So, I figured to be in --

10:56  20  to have to work at a Kroger, you had to join the union

21  even though that Texas is a right-to-work state.

22      Q.  So, you had dues taken out of your check every

23  week?

24      A.  Yeah, payday.  They would take them out 6 or 7

10:56  25  dollars a -- every paycheck.

**LEWIS SOLOVITZ**

45

1     Q.   Do you -- during the time that you worked at

2 Kroger, did you ever read that document?

3     A.   When I first got the -- the -- the pamphlet at

4 the orientation, I skimmed through it, but on a daily

11:12  5 basis, no, I did not.

6     Q.   Did you understand that if you were unhappy

7 with something that Kroger did to you, that you had a

8 right to file something called a grievance?

9     A.   Like I said, I really didn't know about that

11:12  10 because I -- I didn't study the -- the book all the

11 time.

12    Q.   Okay.  When -- when -- when you resigned from

13 Kroger and we -- we're here because of the dispute over,

14 you know, the circumstances surrounding your

11:12  15 resignation, which you claim was a termination, did --

16 at any time after that, did you ever go to the union and

17 complain about the way you were treated by Kroger and

18 ask for the union to file a grievance?

19    A.   I did have the union representative of my

11:12  20 store go up to the -- to the meeting that was being

21 accused of.  And I asked him, Well, what should I be

22 doing?  And he gave me the -- the authorization, It's a

23 good idea to resign.

24    Q.   Okay.  So, that was the advice that he gave

11:13  25 you?

LEWIS SOLOVITZ

1 A. Right.  That's what he told me.  And I figured

2 that he would do more than just say, Resign.  I kind of

3 figured he would look for an investigation or any kind

4 of stuff that could help me out; but for the union,

11:13 5 that's what you pay the union to help you out and -- for

6 issues like something like this, but he didn't have

7 nothing.  He didn't try to say anything to stop -- he

8 just said, You just need to resign.

9 Q. Okay.  And after -- after you resigned, did

11:13 10 you have any subsequent discussions with anybody from

11 the union?

12 A. No, I don't recall calling anybody up in the

13 union because at the time, I was -- I was already

14 nervous that if I didn't -- if I didn't sign that piece

11:14 15 of paper, I was going to be arrested and all that.

16 Q. Okay.  I want to turn your attention to Page 5

17 of Exhibit 2.  Do you see, "Article 6, Discharge and

18 Discrimination"?

19 A. Uh-huh.

11:14 20 Q. Okay.  And there's a section there that talks

21 about the circumstances under which an employee can be

22 fired.  Do you see that?  If you look at Section 6.02.

23 It says:  "An employee may be discharged for proper

24 cause, and the employer shall give notice in writing of

11:14 25 such discharge to the union."  Right?

1 A. But I didn't do anything wrong.

2 Q. I understand.  But if you --

3    MS. UMOJA-JUSTICE:  Just answer the

4 question.

11:14 5 Q. (By Mr. Barron)  If you didn't do anything

6 wrong and you felt like the co -- the company was

7 treating you unfair, isn't it true that you had a right

8 to pursue your rights under this Collective Bargaining

9 Agreement?

11:15 10 A. I understand.  That's why I had Charles come

11 up to the -- up to the meeting because I wanted to make

12 sure that this guy that is the union representative will

13 help me out in this issue; and he just stood there

14 listening to what they were all telling me, and he

11:15 15 didn't say, Stop, wait a minute, Lewis, don't do

16 anything, let's end this meeting.  He didn't say any of

17 that stuff.  He just said, Lewis, just sign the paper.

18 Q. Okay.  And you never -- you never asked

19 anybody else with the union to challenge --

11:15 20 A. Well --

21 Q. -- what Kroger had done to you?

22 A. No.

23 Q. After -- well, let's go back to -- let's go

24 back to the -- stay with Kroger.  Did you ever apply for

11:16 25 any promotions during the time that you worked for --

LEWIS SOLOVITZ

1    Q.   So, the record is clear.

2    A.   It -- it all --

3    Q.   That's okay.

4    A.   It was -- it was on a Monday.

11:17  5    Q.   Okay.  Let's -- did you fill out a leave of

6 absence request for that -- for that surgery?

7    A.   By -- when I was at the store, I was having my

8 symptoms of not feeling well, and I went to the -- one

9 of the managers, and they didn't bother calling an

11:17 10 ambulance or anything.  They just said can I drive

11 myself to the hospital.  And I said, Well, I can't.  I'm

12 not capable of driving.  I don't even know what I'm

13 doing.  I was -- I was delusioned and not knowing what I

14 was doing.  So, I called my wife, and she took me to the

11:18 15 hospital.  And then they just -- they looked at me, and

16 they said you're going to have a heart attack, and

17 that's where they said, Okay, you're staying put.  And

18 they did a test on me, and that's when they found out I

19 was clogged up.  And -- and they said it was lucky that

11:18 20 my wife took me to the hospital.

21    Q.   Okay.

22           (Exhibit No. 3 was marked.)

23    Q.   Okay.  Mr. Solovitz, I've handed you what's

24 been marked as Exhibit 3 --

11:18 25    A.   Yeah.

**LEWIS SOLOVITZ**

50

1    Q.    -- to your deposition.  And this looks like a

2  Request For Leave of Absence dated in 2006 between

3  September and October.  Would this be the time period

4  that you were off for your surgery?

11:19    5    A.    I believe so because in -- it must be.

6    Q.    I think you -- you said that it was around

7  Labor Day.

8    A.    It was on -- it was on Labor Day.  It was on a

9  Monday because I went to work on a Sunday -- or it was a

11:19    10  Monday, whatever day it was.  I'm confused.  But that's

11  -- that's -- it was on a Labor Day, and I was at work.

12  It happened around 9:00 o'clock in the morning.  And

13  they -- so, it was probably that time frame because I

14  was in the hospital for about a month and then -- or

11:19    15  three weeks or something like that.  And then I had

16  to -- I told them, I said, I could come back to work

17  because my cardiologist said it's okay for me to come

18  back but very light duty, not to stress myself out or

19  lift anything heavy.

11:19    20    Q.    Do you --

21    A.    So, that's why they didn't put me as a sacker.

22    Q.    All right.  During the time that you worked at

23  Kroger, did you -- were there any other occasions where

24  you took a month off for medical reasons?

11:20    25    A.    I do not believe so because this would be the

1    you?

2         A.    Basically, she does it, she -- because she's a

3    stay-home mom.  I'm -- I'm at work.

4         Q.    Sure.  So -- so, where does she shop?

11:30   5         A.    She'll shop at a lot of different Krogers, the

6    one on -- the one on Buffalo Speedway, the one on Post

7    Oak.  Wherever she is in -- whatever neighborhood she's

8    at, but she'd rather go to Kroger to shop.

9         Q.    Okay.  Do you get a discount at Kroger?

11:30   10        A.    With the -- with the card it was, I believe,

11   ten percent.

12        Q.    So, as an employee, you got a ten percent

13   discount?

14        A.    Yeah, for the immediate family.

11:30   15        Q.    How much are you making right now at Target?

16        A.    7.45.

17        Q.    Do you have benefits?

18        A.    Yeah.

19        Q.    You do?

11:31   20        A.    I have health -- health.

21        Q.    Health insurance?

22        A.    Health, dental, and -- yeah.

23        Q.    Do you pay for your -- your benefits?

24        A.    Yeah.

11:31   25        Q.    Okay.  Is it -- is it more expensive or

1    cheaper than what you paid at -- at Kroger?

2         A.    I believe at Kroger was $5 a month -- a week.

3    So, you add it up, $20, like I say, between -- but I

4    don't believe I had vision or dental.  I think it was

11:31    5    just medical.  So, I think it was -- it was less because

6    I got less.

7         Q.    Okay.  So -- so, Kroger, your benefits were --

8    cost a little bit less, but you got less --

9         A.    Right.

11:31    10         Q.    -- and now at Target, it costs you a little

11    bit more, but you get more?

12         A.    Correct.

13         Q.    Okay.  So, do you think you're better or worse

14    off with your benefits at Target versus Kroger?

11:32    15         A.    It varies.  But I -- I -- this I have, I could

16    go to my -- still go to my same physician.  I could go

17    to Eye Master to go get my eyes examined, and with

18    dental, I could go to any dental hygiene I want to go

19    to.

11:32    20         Q.    Okay.  So, you have better benefits at Target

21    than you did at Kroger?

22         A.    Yeah.

23         Q.    And you're making currently 7.45 an hour?

24         A.    Yes, I am.

11:32    25         Q.    What -- what was your starting pay for -- at

LEWIS SOLOVITZ

```
 1        A.    Okay.  I'm --
 2        Q.    -- did you ever --
 3        A.    Myself --
 4        Q.    Yeah.
 5        A.    -- myself, I don't recall.
 6        Q.    You don't remember coming in and going to a --
 7  a pharmacy and getting your prescription filled and
 8  getting a gift card back?
 9        A.    I don't recall.
10        Q.    How about when -- when they were putting them
11  on the Plus Cards, do you remember ever getting a
12  prescription and receiving money onto one of the Plus
13  Cards?
14        A.    At the time that all that was -- the Plus Card
15  stuff, my wife was picking up -- or my brother-in-law
16  was picking up.  But I would have -- I was not in the
17  picture of that.
18        Q.    So, you wouldn't have -- you wouldn't be the
19  one actually picking up the prescriptions?  That would
20  be your wife or someone else?
21        A.    Correct.
22        Q.    Okay.
23        A.    I was just going to work and...
24        Q.    Now, when -- when -- when the gift cards were
25  -- were being used, did your wife ever give you gift
```

11:55 (lines 5, 10, 14/15, 20, 25)

LEWIS SOLOVITZ                                        84

1   A.   Uh-huh.

2   Q.   That same day -- if you turn the page -- on

3   the next page, there's a gift card issued, same day from

4   Store 313 for $20.

12:02  5   A.   Okay.

6   Q.   So, can you think of some good reason why you

7   would take prescriptions to two different stores on the

8   same day?

9   A.   Huh.  It's possible that you didn't have the

12:02  10   -- the medication available, and they called up the

11   other store, and that's how this one popped up.  I --

12   like I said, I was just working at the store.  I didn't

13   know what was happening because I -- again, I didn't

14   think that I was doing anything wrong with my gift card.

12:02  15   Q.   Okay.  Well -- and I'll represent to you that

16   if you look at the -- the July 25th transactions, if you

17   turn the page, it looks like there was one on July 25th

18   issued from 314, another one on July 25th issued from

19   355, and another one issued from 735.  So, again, three

12:03  20   different stores, three different gift cards.  That

21   looks a little suspicious, doesn't it?

22   A.   To somebody that doesn't know what this is all

23   about, yeah; but that's not involves me because I don't

24   know.  I mean, like I say, they probably called up the

12:03  25   stores.  They said they don't have it, and my --

**LEWIS SOLOVITZ**

1   probably my -- one of my family members needed the

2   medication, and they said, Okay, we have it, we'll take

3   care of it.

4        Q.   But you don't know that that happened, do you?

12:03   5        A.   But I -- but, like I said, I have no clue

6   because I was doing my job, going to work and going

7   home.

8        Q.   Do you know if Kroger had limits on the number

9   of gift cards that you could receive on one transaction?

12:03   10   In other words, if you had three -- if you brought in

11   the store three prescriptions, isn't it true that you

12   could only get one gift card per transaction?

13        A.   I don't recall.

14        Q.   You don't -- you don't know what the policy

12:03   15   was?

16        A.   No -- no, I don't.  I'm -- I do not recall.

17        Q.   So -- so, the way that you would get around

18   that policy would be to split up your prescriptions and

19   go to three different places and get -- and get a gift

12:04   20   card each one.  That would be one way to get around it,

21   right, if someone was trying to get around it?

22        A.   I don't -- I can't recall.  I'm sorry.

23        Q.   If that's what was happening, would you agree

24   that that was -- that was theft?

12:04   25        A.   I -- I couldn't agree on that because to my

1  live --

2        A.    Brenda is my sister.

3        Q.    She's your sister, but she does not live in

4  the same house that you live in.

12:32   5        A.    But we spend all -- almost all our life at her

6  house.

7        Q.    I understand.  But please answer my question.

8  My question is:  Your sister does not live with you?

9        A.    To go home to my house to sleep, no, she does

12:32  10  not go home to my house to sleep; but the majority of

11  the family, the -- my kids, we are at her house,

12  basically more than a normal person visiting.

13        Q.    But when someone asks you your address, you

14  don't give the same address that Ms. -- that Brenda

12:32  15  Solovitz lives at.  You give a different address, right?

16        A.    That, I give my home tel -- my home address.

17        Q.    And you have your own home address, you have

18  your own home telephone number, right?

19        A.    Basically, yes, I do.

12:32  20        Q.    And you receive mail at the other address?

21        A.    Yes, I do.

22        Q.    Okay.

23        A.    But if I -- even today, I'm still going over

24  to the house for dinner and everything else, like, on a

12:33  25  normal basis.

LEWIS SOLOVITZ

1    A.    I know there's cameras all over the store.

2    Q.    Yeah.

3    A.    But I wasn't aware of -- or concerned of what

4  I was doing because I didn't do anything.

12:37  5    Q.    Well, do you know Kroger has videotape of you

6  making purchases without paying any money and just using

7  your Kroger Plus Card?

8    A.    It's a fact that my wife told me there was

9  some money on the account, which, in fact, it was a

12:37  10  gift.  I haven't -- I have no idea.

11    Q.    Would it surprise you that -- that if Kroger

12  had videotape of you making purchases and just --

13    A.    I -- I --

14    Q.    -- swiping your Kroger Plus Card and using

12:37  15  that instead of money?

16    A.    But I -- I told you that if my wife had told

17  me that the card had money on it, it's still -- what was

18  wrong with her telling me there was money on the account

19  if -- if she had got it from transferring a -- a

12:38  20  prescription from one store to another with a valuable

21  coupon.

22    Q.    Well, let's -- let's look at the balances,

23  though.  If you look at the -- the number of credits

24  here, for -- for example, there's one on August 29th for

12:38  25  $30, there's one on September 12th for $30 --

1    balance?

2          A.    I didn't even know how much was on there like

3    I mentioned.

4          Q.    Well, if -- if Kroger witnesses, if -- if --

12:39    5    if I told you that various members of management are

6    going to testify that you asked them on occasion how

7    much money you had on your Plus Card, would that

8    surprise you?

9          A.    I can remember going to one or two of them

12:39   10   saying that I know there's money on it, but I wouldn't

11   specifically say how much is in it.

12         Q.    Well, you went to Mr. McKnight and asked

13   him --

14         A.    Oh, yeah.

12:39   15         Q.    -- about your balance.

16         A.    I just said I remember going to Mr. Mc --

17   McKnight.  I won't -- I won't deny it.

18         Q.    Okay.

19         A.    I went to Brian, I believe, right before this

12:40   20   whole stuff went -- came in.  I went to him, and I said,

21   You know, Brian -- I said, I know there's some money on

22   my account.  And he said, Do you know how much it is?

23   And I said, I really don't know.  And he said, Okay,

24   I'll check into it.

12:40   25         Q.    So, you --

1    to pay for the entire purchase.  In other words, you

2    didn't pay anything out of pocket --

3          A.   Right.

4          Q.   -- you didn't use a credit card, you didn't

12:41   5    use cash --

6          A.   Correct.  I --

7          Q.   Okay.  And when that happened, did you then

8    get a receipt that tells you how much you had left on

9    the card -- or on the Plus Card?

12:41   10         A.   I wasn't looking into that because I -- you

11   know, I didn't really care because I was just buying my

12   lunch and going upstairs and coming back down to work.

13   And, again, I wasn't caring because I didn't think at

14   the time or even I'd be sitting here I did anything

12:41   15   wrong.

16         Q.   But isn't it true, Mr. Solovitz, that you got

17   the benefit of whatever your wife was doing?  You knew

18   that she was doing something --

19         A.   But she's my family member -- member.  As long

12:41   20   as my -- my daughters and my sister and my

21   brother-in-law, they're all my family.  So, I figured

22   whatever they're doing, they're shopping, getting their

23   medication, it was all legit, without doing anything

24   wrong.

12:42   25         Q.   So, you thought -- nothing -- nothing about

**LEWIS SOLOVITZ**

1  finally got my little sense of order, and I went to one

2  of the team members.  And I said to her -- I said, Look,

3  I don't feel good, I think I need to go to the hospital.

4  And she said, Can you drive yourself to the hospital?

12:50  5      Q.   And who told you that?

6      A.   One of the team leaders.

7      Q.   Do you remember the name?

8      A.   I think it was Yolanda.  I don't remember her

9  last name.

12:50  10     Q.   Okay.  What -- you just told her that you were

11  not feeling well.

12     A.   I was not feeling well, and I started feeling

13  tightness in my -- and tingling.

14     Q.   You didn't tell her that you were having a

12:50  15  heart attack, did you?

16     A.   I didn't know what I was having.  I was just

17  feeling really bad and -- and I said -- and I started

18  feeling tingling in my -- and I was tight -- tightness

19  in my chest.  I didn't know I was having a heart attack

12:51  20  or not.

21     Q.   Are you sure you told her you were having

22  tightness in your chest?

23     A.   I could be saying that I -- I was -- I could

24  be saying I could have had a heart -- I can't recall

12:51  25  back then.

**LEWIS SOLOVITZ**

110

| | | |
|---|---|---|
| | 1 | Q.   Okay. |
| | 2 | A.   I was -- I was -- I was not thinking straight, |
| | 3 | but I can remember saying, I need to go to the hospital. |
| | 4 | And her -- her remark was, Can you drive yourself. |
| 12:51 | 5 | Q.   Okay.  And then what did you say? |
| | 6 | A.   And I said, I'll get my -- I'll get my sister |
| | 7 | -- I mean, my wife, rather, and that's when I called my |
| | 8 | wife. |
| | 9 | Q.   Did you ever ask for her to -- to call an |
| 12:51 | 10 | ambulance? |
| | 11 | A.   I kind of figured she had the common sense. |
| | 12 | Q.   Well -- |
| | 13 | A.   As a -- |
| | 14 | MR. BARRON:   Objection, nonresponsive. |
| 12:51 | 15 | A.   -- manager -- |
| | 16 | Q.   (By Mr. Barron)  Did you ever ask for her to |
| | 17 | call an ambulance for you? |
| | 18 | A.   No, I didn't.  I figure common sense, if |
| | 19 | someone is not feeling well, you call an ambulance. |
| 12:51 | 20 | MR. BARRON:   I'm going to object to that |
| | 21 | as being nonresponsive. |
| | 22 | Q.   (By Mr. Barron) After your wife drove you to |
| | 23 | the hospital, what happened? |
| | 24 | A.   They said you -- it sounds like you are |
| 12:52 | 25 | definitely having a heart attack, and they gave me a |

LEWIS SOLOVITZ

1    nitroglycerine pill.  And they did tests, and they said

2    you have to -- a bunch of arteries clogged.  And they

3    took me upstairs, and they said, okay, you're going to

4    be -- you're next to get your operation.

12:52    5        Q.    How long was it from the time you went into

6    the hospital until you had your operation?

7        A.    Next day.

8        Q.    And you said it was a -- a double bypass,

9    quadruple bypass?

12:52    10        A.    Quadruple.

11        Q.    Okay.  Did they tell you why -- why, you know,

12    you needed a quadruple bypass?  Was it a blockage or

13    something --

14        A.    They said that 98 of my -- percent of my

12:52    15    arteries were clogged.

16        Q.    Okay.  How long were you in the hospital?

17        A.    A good -- almost a month, maybe three, three

18    and a half weeks, something like that, give or take.

19        Q.    Do you -- who at Kroger knew about your --

12:53    20    your surgery?

21        A.    After -- after it?

22        Q.    Uh-huh.

23        A.    Basically, almost everybody.

24        Q.    Okay.  Is that because you told them?

12:53    25        A.    I know my wife told them that I had -- one of

**LEWIS SOLOVITZ**

1  it was, like, they were, like -- they were, like,

2  pushing me away.  So, I said, okay, bah, bah, bah.  And

3  it wasn't the -- the fun kind of way that it was

4  beforehand.  And that's how I -- I saw it.  I mean, it

12:54  5  was like you didn't want me there no more.

6      Q.  Well, was there anything specific that anyone

7  said to you that you can recall that you felt was -- was

8  unfair or inappropriate?

9      A.  I don't know.  They would -- I just don't

12:55  10  recall.  It was just the way that they were just

11  treating me, like -- like, it wasn't the way it was

12  beforehand.

13      Q.  Did you receive the same shifts that you had

14  before?

12:55  15      A.  I did have cut hours.  They did change my

16  hours.  And so, I wasn't making the same amount of money

17  I was beforehand.

18      Q.  Well, what was changed?

19      A.  That I wasn't a sacker anymore.  They put me

12:55  20  on cleaning material -- cleaning.

21      Q.  That was during the time that you were on

22  light duty, correct?

23      A.  Yeah.

24      Q.  So, that was because of your medical needs,

25  correct?

LEWIS SOLOVITZ

114

1    A.    Right.

2    Q.    That was not something that Kroger did.  It

3  was, in fact, something that you asked for to

4  accommodate your medical restrictions.

12:56    5    A.    Right.  And that's when it was all starting

6  that -- how I -- how differently they were treating me

7  and all that.

8    Q.    Okay.  Well -- well, you were in a different

9  job --

12:56    10    A.    Yeah.

11    Q.    -- right?

12              For a period of time?

13    A.    Yeah.

14    Q.    And do you know if Kroger normally had someone

12:56    15  in that position that you were in doing the cleaning, or

16  was that something that was done special for you?

17    A.    They had different shifts.  So, they had,

18  like, they put me there to help that person out, like,

19  one person would be doing half the store, and I'd be

12:56    20  doing half the store.

21    Q.    But under a normal circumstances, would Kroger

22  have had the same number of people, in other words, two

23  people doing that; or was that something that they did

24  to accommodate your special medical needs?

12:56    25    A.    I'm -- probably, I'm not aware of that, but

1  it's possible they put it to help -- to balance my

2  needs.

3       Q.   Okay.  And -- and once those restrictions were

4  lifted, you went back to being a sacker, correct?

12:56    5       A.   Correct.

6       Q.   And then your hours were restored to where you

7  were at before, right?

8       A.   Basically, yeah.

9       Q.   Okay.  Is there anything else specific that

12:57  10  you can recall in how Kroger allegedly treated you

11  differently or mistreated you after your surgery?

12       A.   Well, I could say that there's a guy that had

13  a heart attack over there, too, and they called an

14  ambulance for that person.

12:57  15       Q.   Okay.  Who was that?

16       A.   That was Leonard.

17       Q.   Leonard who?

18       A.   I don't -- I don't -- I don't recall his last

19  name.

12:57  20       Q.   Same store?

21       A.   Yeah.  Oh, yeah.  They called -- they called

22  an ambulance for him.  And, like, okay, he has a heart

23  attack, but I'm having one, and I don't get -- and I had

24  to call my wife.

12:57  25       Q.   But you didn't tell anybody you were having a

1      Q.    Okay.  No one from Kroger -- Kroger physically

2  touched you or assaulted you or restrained you --

3      A.    No.

4      Q.    -- during that -- right?

13:15  5      A.    I was sitting down here, just like I'm sitting

6  right here.

7      Q.    Did Ms. Lucas ever raise her voice with you,

8  yell at you?

9      A.    No, I can't recall her -- it was like a normal

13:15  10  voice.  It could have been a little loud about asking me

11  questions and all that.

12      Q.    She didn't curse at you --

13      A.    No.

14      Q.    -- or use any profanity?

13:15  15      A.    No.

16      Q.    Do you recall Mr. Mitchell from the union ever

17  objecting to the way Ms. Lucas was handling the -- the

18  interview?

19      A.    I can't recall the whole arguing, because once

13:15  20  she said I was under arrest for stealing and I was going

21  to go to jail, like I said, I -- that's all I was

22  thinking.  I wasn't hearing anything else.

23      Q.    Okay.  Let me stop you there.  You testified

24  that she said that you were under arrest and going to

13:16  25  jail --

1        A.    I mean -- I mean --

2        Q.    She never told you that you were actually

3   under arrest, did she?

4        A.    No, okay.  That I was going to go to jail.

13:16    5        Q.    Now, did she say that you were going to go to

6   jail or that you could go to jail?

7        A.    That I was going to go to jail unless I paid

8   up the 600 and something dollars.

9        Q.    And those were the exact words that you

13:16   10   recall?

11        A.    If I didn't pay up the money today, I was

12   going to go to jail.

13        Q.    Have you ev -- had you ever met Ms. Lucas

14   prior to that day?

13:16   15        A.    If she was walking around the store, I

16   wouldn't recall the -- notic -- noticing her face.

17        Q.    And did she tell you how the -- how Kroger

18   identified you for the investigation?

19        A.    She says that's how she -- I found out about

13:16   20   the credit cards.

21        Q.    She said that Kroger has a system where they

22   -- the computer monitors transactions and they look for

23   red flags, right?

24        A.    But, again, I didn't know what she was talking

13:17   25   about, but she mentioned credit -- she was mentioning

LEWIS SOLOVITZ

```
 1        Q.    Okay.  I'll represent to you that this is a

 2   report from Cari Lucas about her meeting with you.  If

 3   you look at one, two, three... seventh paragraph down,

 4   there's a paragraph that begins:  "Lucas asked Solovitz

 5   if he remembered signing Plus Card policy, and he stated

 6   yes."

 7                    Do you see that?

 8        A.    Yeah, that was when I had orientation.

 9        Q.    Okay.  So, you -- you agree that you told her

10   -- that she asked you that and that you said yes?

11        A.    Yeah.

12        Q.    Okay.  And it says:  Solovitz then asked, "If

13   they hadn't changed the coupons from the gift cards to

14   the Rewards, would I still have gotten caught?"  Lucas

15   informed Solovitz that he would have eventually gotten

16   caught, regardless of the change.

17                    Is that true?  Did -- did you have that

18   discussion with Ms. Lucas?

19        A.    Can you -- can you tell me where that was,

20   please?

21        Q.    Sure.  It's the seventh paragraph down.

22        A.    Uh-huh.

23        Q.    The one that says:  "Lucas asked Solovitz if

24   he remembered..."

25        A.    Okay.
```

14:17 (line 5)
14:17 (line 10)
14:17 (line 15)
14:18 (line 20)
14:18 (line 25)

1      A.    And they didn't want me to get stressed out.

2   They just wanted me to do my job with the company, and I

3   was doing that.

4      Q.    So, you asked your brother-in-law to get

14:24   5   involved on your behalf, but you never asked anybody in

6   the union to get involved on your behalf, right?

7      A.    The union wasn't even helping us with trying

8   to solve the situation with the -- the going on strike.

9      Q.    Okay.

14:24   10             MR. BARRON:  I think I'm going to object

11   to that as being nonresponsive.

12      Q.    (By Mr. Barron)  My question was:  You asked

13   the brother-in-law to help you clear this up, but you

14   did not ask anybody at the union to help you clear it

14:25   15   up, right?

16      A.    At the time, that's where Charles was in

17   the -- that -- the room at that time, I figured he could

18   help me out in this whole issue.

19      Q.    Right.  But at this point, this is after

14:25   20   you've already resigned --

21      A.    Yeah.

22      Q.    -- Charles -- Charles is done?

23      A.    Right.

24      Q.    Now, you're asking your brother-in-law to help

14:25   25   you, right?

LEWIS SOLOVITZ

1      A.   At the time, I figured if I -- if I didn't --
2  if he couldn't help me at that moment, why would you
3  think the union would help me out?
4      Q.   Okay.  So, then the answer to my question is
5  you didn't go to the union after that -- after the day
6  you resigned --
7      A.   I figured once you resigned -- you resigned,
8  you're not even in the union anymore.
9      Q.   Okay.
10      A.   So, how could the union help me if I'm not
11  with the company anymore.
12      Q.   So, the answer to my question is, no, right?
13  Right?
14      A.   If -- yeah.
15      Q.   Okay.  In terms of timing, your meeting with
16  Ms. Lucas occurred on October 31st, 2007, right?
17      A.   Correct.
18      Q.   And your leave of absence for your heart
19  surgery was in September, October of 2006?
20      A.   Correct.
21      Q.   So, it was about a year afterwards.
22      A.   I could say that, yeah, more or -- more or
23  much.
24      Q.   More or less?
25      A.   Yeah.

14:25
14:25
14:25
14:26
14:26

1      Q.    Okay.

2      A.    I was there for quite a long time after the --

3 me coming back, because I was a dedicated employee, and

4 I came to work, never was late, never took off, called

14:26    5 in sick.

6      Q.    And -- and after you came back from your heart

7 surgery, between that time and October 31st of 2007 when

8 you met with Ms. Lucas, no one ever mentioned your heart

9 surgery again, did they?

14:27   10      A.    Some people asked me how I was doing, how I'm

11 feeling, and -- and I would tell them that in -- like I

12 told you, that I need to be out of the heat and the cold

13 and the rain.

14      Q.    Any other discussions other than "how you

14:27   15 doing"?

16      A.    Not on a daily basis, no.

17      Q.    Did -- did you -- did you -- did anybody ever

18 express any -- anybody from Kroger ever express any

19 anger toward you because you took -- took that medical

14:27   20 leave?

21      A.    No.

22      Q.    Your lawyer in this case is claiming that you

23 had a contract with Kroger.  Are you -- are you aware of

24 any contract of employment that you had with Kroger?

14:28   25      A.    What kind of con -- contract?

**LEWIS SOLOVITZ**

1      Q.    I don't know.  That's what I'm asking.

2            Did -- did you ever -- are you -- did you

3   ever have a written contract with anybody at Kroger?

4      A.    No.

14:28   5      Q.    Okay.

6      A.    I don't believe so.  I mean --

7      Q.    Okay.

8      A.    -- for what kind -- what kind of contract was

9   it?

14:28  10      Q.    To my knowledge there isn't one.

11            Did anybody at Kroger ever give you any

12   guarantees that you would never be fired from Kroger?

13      A.    I can only say that the union says that the

14   union will protect you if you have problems with the

14:28  15   company.

16      Q.    Okay.  Did any supervisor or manager at Kroger

17   ever tell you that you would be protected from being

18   terminated or somehow that Kroger is limited in its

19   ability to terminate you?

14:28  20      A.    I don't recall, so, no.

21      Q.    Okay.  To your knowledge no one from Kroger --

22   in Kroger management ever told you that as long as you

23   did your job that you would always have a job at Kroger,

24   nothing to that effect?

14:29  25      A.    Yeah, if you do your job correctly, you -- you

**LEWIS SOLOVITZ**

1   will always have a job at Kroger.

2        Q.   Okay.  Who told you that?

3        A.   Management.

4        Q.   Okay.  Who specifically?

14:29  5   A.   I can't say names because I can't recall

6   names.

7        Q.   Well, okay.  What do you recall them telling

8   you?

9        A.   They would just say that, you come to work

14:29  10  every day, clean -- you know, come -- come and work

11  presentable and you're doing your job right and we ask

12  you to do something and you do whatever needs to be

13  done, you'll have a job always at Kroger.

14       Q.   But they never promised that they wouldn't

14:29  15  terminate you, right?

16       A.   It never came into my mind.

17       Q.   Okay.  In other words, they never promised

18  that if you stole something that you wouldn't be fired,

19  right?

14:30  20  A.   Correct.

21       Q.   Okay.

22       A.   But I didn't think if anything like that would

23  happen to me because I never did anything like that.

24       Q.   Okay.  And you understood that you could be

14:30  25  fired, right, I mean, that there was no --

**LEWIS SOLOVITZ**

1    A.    If -- if I had stolen or some -- done

2    something stupid like that, yeah.

3    Q.    Okay.  But if the store closed, you could be

4    fired, right?

14:30    5    A.    I'm sorry?

6    Q.    If the store closed, you could be fired,

7    right?

8    A.    Well, if the store closed, you mean, like, out

9    of business?

14:30    10    Q.    Yeah.

11    A.    Yeah, of course, you can.

12    Q.    Okay.  You didn't have a contract or anything

13    that protected you from being fired, did you?

14    A.    I mean, they have the -- they have the right

14:30    15    to put me to another store if there's an opening, yeah.

16    Q.    But -- but you -- you don't -- you're not

17    claiming that you had a contract with Kroger --

18    A.    Oh, no.

19    Q.    -- that prevented Kroger from firing you?

14:30    20    A.    No.  I didn't believe there were any kind of

21    contract -- any kind like that around.

22    Q.    One of the other claims that -- that has been

23    made against Kroger in this case is that Kroger said

24    defamatory statements or made defamatory statements

14:31    25    about you.  Do you understand that to be the case?

LEWIS SOLOVITZ                                    157

1    A.   Like what, specifically --

2    Q.   Okay.

3    A.   -- so, I can understand.

4    Q.   Well, that's what I was going to ask you.

14:31    5    A.   All right.

6    Q.   One of the things that -- that -- that has

7    been alleged in this lawsuit is that Kroger made

8    statements about you that are untrue.  Do you understand

9    that to be part of your lawsuit?

14:31    10   A.   I -- I -- I can't answer that question because

11   I can't --

12   Q.   Okay.  Do you -- do you believe that anybody

13   at Kroger has made statements about you that were

14   untrue?

14:31    15   A.   It's possible.  I -- I -- I can't say "yes" or

16   "no," because it's very much possible.

17   Q.   Okay.  Who -- who do you think has made

18   statements about you that were untrue?  Who from Kroger,

19   to your knowledge, has said things about you that are

14:31    20   untrue?

21   A.   Probably management.

22   Q.   Okay.  Who?

23   A.   I have no clue, but I can probably just say

24   management, probably the -- the team leaders.  That's,

14:31    25   you know -- so, if I'm trying to get another job, it

1  will hurt my -- my capability of getting one.

2       Q.   Okay.  Can you point to any specific person

3  and -- and statement that you're claiming was said about

4  you that's untrue?

14:32    5       A.   But I -- I, again, I can't answer that because

6  I don't know that whoever called Kroger up to ask about

7  me took the phone call and told them word for word and,

8  oh, he's a bad employee because he stoled.

9       Q.   But those are all your assumptions, right?

14:32   10  You don't know that that ever took place.

11       A.   Well, I could tell that I had trouble finding

12  a job, and that's why I took the assumption, okay,

13  something is going wrong.

14                   MR. BARRON:  I'm going to object as being

14:32   15  nonresponsive.

16       Q.   (By Mr. Barron)  Do you have any knowledge

17  yourself, personal knowledge, which means you heard it,

18  you saw it, that type of thing --

19       A.   No.

14:32   20       Q.   -- that anybody from -- let me finish, that

21  anybody at Kroger has ever said anything about you

22  that's untrue?

23       A.   To my knowledge, I did not hear it; but,

24  again, after the fact, after I got -- lost my job at

14:33   25  Kroger, anything is possible.

## LEWIS SOLOVITZ
159

1    Q.    So, you -- but you're -- so, you're just
2  basing that on speculation and assumption, right?
3    A.    Because of the fact that it took me quite a
4  long time to find another job.  And I think for the jobs
14:33  5  that I was looking for, I shouldn't have had that much
6  trouble finding one.
7    Q.    And the "quite a long time" that you're
8  describing is two months, right?
9    A.    Two months.  Even just having an answer, but I
14:33  10  wasn't even having an answer.
11    Q.    Okay.
12    A.    Or -- or a letter saying, Thank you for
13  applying for -- but you're underqualified or --
14  underqualified or such and such.  I didn't get nothing.
14:33  15    Q.    Other than the discussion between yourself,
16  Cari Lucas, the union, and -- and the other witness that
17  was there on the date that you resigned --
18    A.    Right.
19    Q.    -- are you aware of any other communications
14:33  20  or statements involving your theft made by Kroger, other
21  than that one day when you were in the room talking
22  about it?
23    A.    That was the only time I ever heard about it,
24  at that moment.  After that fact, I don't know how many
14:34  25  people know about it.

160

1     Q.    Okay.  So, after that day when you resigned

2  and you -- and you left Kroger to your -- you don't --

3  you can't -- you can't point to any specific time or

4  place where anybody from Kroger ever said anything about

5  you stealing --

6     A.    Well --

7     Q.    -- or anything like that?

8     A.    I can say we were in a room next to another

9  room.  So, I guaran -- I can have a sense that there was

10  somebody behind my back listening to the whole

11  conversation.

12     Q.    Okay.  That's just your -- your belief, or do

13  you have some evidence of that?

14     A.    Because when I turned my back, Mike Marino was

15  running out of the -- out of the room.

16     Q.    Mike Marino?

17     A.    Yeah.

18     Q.    He's -- he's in manag -- management, though,

19  right?

20     A.    Yeah.

21     Q.    Okay.  This was the room behind the room you

22  were in?

23     A.    Right.

24     Q.    Was there -- was it -- help -- help me

25  understand.  Are the rooms -- was the door closed and it

**LEWIS SOLOVITZ**

161

1    was another -- do you want a sheet of paper?

2         A.    Yeah.

3         Q.    Okay.  Mr. -- Mr. Solovitz --

4         A.    Okay.

14:35    5    Q.    -- I'm going to hand you a blank sheet of

6    paper --

7         A.    Okay.

8         Q.    -- and --

9         A.    All right.

14:35   10    Q.    -- why don't you draw for me the setup of the

11   rooms that you're talking about.

12        A.    (Complying.)  Here's one room (indicating).

13   Here's the other room (indicating).  And there's a

14   window out here (indicating) that faces the outside.

14:35   15    Q.    Okay.  Why don't you write "window" on the

16   area that you're -- that you're --

17        A.    (Complying.)

18        Q.    Yeah, there you go.

19               Okay.  And it looks like you've made some

14:36   20   smaller squares --

21        A.    Right.

22        Q.    Are those doors?

23        A.    Yeah, this is a window.

24        Q.    Okay.  Why don't you -- why don't you write

14:36   25   "door" --

**LEWIS SOLOVITZ**

162

| | | |
|---|---|---|
| | 1 | A. Okay. Hold on. Make it better. Thank you. |
| | 2 | Q. Okay. And then -- and then -- |
| | 3 | A. And then over here there's another window |
| | 4 | (indicating). |
| 14:36 | 5 | Q. Okay. Why don't you put a -- a -- |
| | 6 | A. "A" and a "B"? |
| | 7 | Q. Put an "A" in the -- in the room you were in. |
| | 8 | A. (Complying.) |
| | 9 | Q. Okay. |
| 14:36 | 10 | A. And right. |
| | 11 | Q. Okay. |
| | 12 | A. And over here is like a -- a desk |
| | 13 | (indicating). |
| | 14 | Q. Okay. Why don't you write "desk" on that. |
| 14:36 | 15 | A. (Complying.) Okay. |
| | 16 | Q. All right. And you were in Room A. |
| | 17 | A. I was in Room A. |
| | 18 | Q. And the door was closed. |
| | 19 | A. Right. This is me over here (indicating). |
| 14:36 | 20 | Q. Okay. Why don't you put "me" where you were. |
| | 21 | A. (Complying.) And there was Charles and the |
| | 22 | other guy, and then over here was Lucas. |
| | 23 | Q. If I told you the other guy was Ryan Orbin, |
| | 24 | would that refresh your memory? |
| 14:37 | 25 | A. No, because -- |

LEWIS SOLOVITZ                       163

1    Q.    You -- you didn't know?

2    A.    -- he --

3    Q.    Okay.

4    A.    -- was just brand new, starting to work there.

14:37    5    Q.    Okay.  So, you were in Room A on your diagram,

6    let's -- let's go ahead and mark it as 16.

7              (Exhibit No. 16 was marked.)

8    Q.    And you were in Room A, and the door was shut.

9    A.    Correct.

14:37   10    Q.    All right.  Now, it looks like, based on your

11    diagram, there's a window between Room A and Room B.

12    A.    Correct.

13    Q.    And to your knowledge, could you hear what was

14    going on in the other room through the windows?

14:37   15    A.    No, I -- I could not.

16    Q.    Okay.  So -- so it's -- it's your

17    understanding that even though there was a window there,

18    the person in -- in Room B could not hear what was going

19    on in Room A, right, unless you were really loud?

14:37   20    A.    Correct, or he was listening to the -- the

21    phone on the intercom.

22    Q.    Okay.  But to your knowledge, no one had a --

23    the intercom on so that --

24    A.    There's no way to tell.  There's no way for me

14:38   25    to see that they had the intercom, because the telephone

1    was not facing for me to see the light up -- the light

2    up.

3          Q.    Okay.   Let me -- let me rephrase so -- so

4    we're clear.

14:38  5          A.    Okay.

6          Q.    You don't know whether the intercom was on and

7    someone was listening in, right?

8          A.    I did not see the intercom on because there

9    was no way for me to see the intercom on.

14:38  10          Q.    And you -- you don't have any reason to

11    specifically believe that it was on, do you?   No one

12    ever told you it was on?

13          A.    It's -- I had a sense that somebody was back

14    there.

14:38  15          Q.    Back where?

16          A.    In the -- in Room B --

17          Q.    Okay.

18          A.    -- watching and seeing what was going on in

19    the room.

14:38  20          Q.    Were there blinds or something --

21          A.    No.

22          Q.    -- obstructing the windows?

23          A.    No.

24          Q.    So, it was just open windows?

14:38  25          A.    Correct.

**LEWIS SOLOVITZ**                                                                165

         1          Q.     Okay.  You could turn around and see into Room

         2    B, then, right?

         3          A.     If I looked -- I looked, but at the time I was

         4    not focusing on any of that but trying to figure out why

14:38    5    am I going to jail.

         6          Q.     Okay.  At any point in -- in your meeting with

         7    Ms. Lucas, did you ever turn around and see if there was

         8    anybody in Room B?

         9          A.     And -- the only time I ever turned around when

14:39   10    I got up to leave, that's when I saw Michael, like, run

        11    out of the room.

        12          Q.     Okay.  Michael --

        13          A.     Marino.

        14          Q.     Marino, who is the -- the co-manager?

14:39   15          A.     Right.  Correct.

        16          Q.     Okay.  Is that -- would that room normally be

        17    one that would be used by management?

        18          A.     It varies.  That was -- that's Kendra's room

        19    when she's -- and this is Brian McKnight's room.

14:39   20          Q.     Okay.  But it wouldn't be out of the ordinary

        21    for a member of management to be in that room?

        22          A.     On a daily basis, anything is possible.

        23          Q.     Okay.  I mean, there are legitimate reasons

        24    why a manager might want to go in that room.

14:39   25          A.     Correct.

**LEWIS SOLOVITZ**                                          166

1     Q.    Okay.   Anybody else that you think might have
2   been listening in?
3     A.    Like I said, I -- I wasn't a hundred percent
4   sure.   But, again, like I said, when I saw Michael run
14:39   5   out of -- out of the -- the room like that, made me have
6   the assumption that he heard the whole conversation on
7   the intercom.
8     Q.    But you don't know that he heard the whole
9   conversation --
14:40  10     A.    Like I said, I did not see the intercom
11   because it was be -- it was being blocked.  It's not
12   like your everyday -- it was just a telephone, and all
13   they do is press a button and you're on, you know, the
14   walk.
14:40  15     Q.    Would the whole store be able to hear what was
16   going on if you put it on intercom?
17     A.    Not -- it was not that kind of intercom.  It
18   was like speakerphone.
19     Q.    Okay.   Did you see Mr. Marino in the other
14:40  20   room on the phone?
21     A.    Not if he was on the speakerphone, you won't,
22   you don't have to.
23     Q.    Okay.   But you don't know that any of that
24   occurred.   That's just speculation.
14:40  25     A.    My speculation is about the way I saw him

**LEWIS SOLOVITZ**

1   leave that room, quick.

2       Q.   Did you ever see Ms. Lucas hit the phone or

3   hit any buttons on the phone?

4       A.   I didn't see her -- it's possible she had

14:40   5   already done it before the whole meeting started.  To my

6   knowledge, I'll bet you it was even vid -- taped.

7       Q.   Did you tape the conversation?

8       A.   I didn't tape it -- the conversation, but,

9   again, they did not say it was being one, but I

14:41   10   guarantee there is one.

11      Q.   Why do you guarantee there is one?

12      A.   Because -- why not?  Hard ball.  You're

13   putting -- you're trying to say something and I'm trying

14   to say something.

14:41   15      Q.   Okay.  Other than that conversation with

16   Ms. Lucas that you think was overheard by Mr. Marino,

17   are there any other statements that were made by Kroger

18   employees that to your knowledge about your -- your

19   alleged theft or the --

20      A.   At the theft part --

21      Q.   -- the statements that are made that day?

22      A.   The theft part ended right after this whole

23   mess was saying, okay, you're going to pay back the

24   money.  You -- you're free to go.  But all this time

14:41   25   when I was sitting on that desk and I thought there was

LEWIS SOLOVITZ

1  that your wife abused the system, but you -- since you

2  didn't know about it --

3      A.    Correct.

4      Q.    -- you weren't responsible for it.

14:47  5      A.    Correct.  And I --

6      Q.    Okay.

7      A.    -- right.

8      Q.    Do you agree that your wife took advantage

9  of -- of the system that Kroger had in place?

14:47  10      A.    I didn't think anybody in my family did

11  anything wrong.

12      Q.    So, you disagree with the TWC?

13      A.    I'm not saying -- I'm -- I'm reading what they

14  say.  I said, I know for a fact that my family would not

14:48  15  steal, take advantage of anything.  So...

16      Q.    Okay.  Have you talked to anybody from Kroger

17  since you left?

18      A.    No, I haven't even set foot in any Kroger's at

19  all.

14:48  20      Q.    You were out of work for about two months

21  between Kroger and Target, right?

22      A.    You could say that, because this -- this

23  happened on the 31st and I got hired in January, so...

24      Q.    Okay.  Did you have any other income during

14:49  25  that two months?  You had unemployment that you got

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF TEXAS
 2                        HOUSTON DIVISION

 3   LEWIS SOLOVITZ                     *
                                        *
 4   VS.                                *  CIVIL ACTION NO.
                                        *       H-09-0343
 5   THE KROGER CO., INC.               *

 6                  REPORTER'S CERTIFICATION TO THE
                     DEPOSITION OF LEWIS SOLOVITZ
 7                     TAKEN ON JULY 28, 2009

 8        I, MYLINDA TUBBS FAIRCLOTH, Certified Shorthand

 9   Reporter in and for the State of Texas, hereby certify

10   to the following:

11        That the witness, LEWIS SOLOVITZ, was duly sworn by

12   the officer and that the transcript of the oral

13   deposition is a true record of the testimony given by

14   the witness;

15        That the deposition transcript was made available

16   on August  6 , 2009 to the witness or to the attorney

17   for the witness for examination, signature, and return

18   to Elite Reporting Service, Inc., by September  6 ,

19   2009;

20        That pursuant to information given to the

21   deposition officer at the time said testimony was taken,

22   the following includes all parties of record:

23        Ms. Adjua Rochelle Umoja-Justice, Attorney for

24   Plaintiff;

25        Mr. David L. Barron, Attorney for Defendant.
```

**LEWIS SOLOVITZ**                                                    228

1        I further certify that I am neither counsel for,

2    related to, nor employed by any of the parties in the

3    action in which this proceeding was taken, and further

4    that I am not financially or otherwise interested in the

5    outcome of this action.

6        Further certification requirements will be

7    certified to after they have occurred.

8        Sworn to by me this _____5th_____ day of August, 2009.

9

10   _____

11   MYLINDA TUBBS FAIRCLOTH, CSR
     Certification No. 2896
12   Expiration Date: 12-31-10

13   ELITE REPORTING SERVICE, INC.
     Registration No. 75
14   3637 W. Alabama, Suite 155
     Houston, Texas 77027
15   (713) 623-4434

16

17

18

19

20

21

22

23

24

25